OPINION

Joe Shirley, Jr., in his capacity as President of the Navajo Nation and individually, filed an action for an ex parte temporary restraining order and preliminary injunction against the Navajo Nation Council and Lawrence T. Morgan, in his capacity as Speaker and individually, in the Window Rock District Court, to enjoin enforcement of Navajo Nation Council Resolution CO-41-09 placing him on administrative leave. The district court ruled that Resolution CO-41-09 is null and void and, therefore, unenforceable. We affirm the judgment invalidating Resolution CO-41-09 on different grounds.
I
BACKGROUND
This appeal concerns a clash between the Executive and Legislative Branches of our government. On October 26, 2009, the President, Joe Shirley, Jr., was placed on administrative leave by the Navajo Nation Council (Council) by enactment of an emergency legislation CO-041-09 pursuant to 11 N.N.C § 240(C). The measure was based on an investigative report returned by two law firms into the President’s role in two business dealings that has never been made public, nor shared with the President. President Shirley filed for emergency injunctive relief in the district court on December 7, 2010, claiming that the legislation putting him on administrative leave is invalid as mandatory statutory enactment procedure was not followed; that the measure is a bill of attainder; that it violates Dim bi beenahaz’ámm by disabling a naat’áanii chosen by the People from carrying out the responsibilities entrusted to him; that it violates separation of powers; that it violates his right to due process under statutory and fundamental law; and that irreparable harm has occurred and will continue to occur in the absence of the President. On December 14, 2009, the court applied the six-factor test in Chapo v. Navajo Nation, 8 Nav. R. 447, 461, 5 Am. Tribal Law 384 (Nav.Sup. Ct.2004) and determined that the Speaker of the Navajo Nation Council (Speaker) and Council had failed to strictly comply with statutory enactment procedure pursuant to 2 N.N.C. § 164 and acted outside the scope of their legislative authority. The court further invalidated CO-41-09 for the same reason.
The Speaker and Council appealed on January 13, 2010, claiming that the President had initiated the action in violation of 2 NNC 1964 by not first seeking the approval of the Attorney General; that the President had failed to give the Navajo Nation timely notice of intent to file suit as required by the Sovereign Immunity Act; that the President failed to serve the complaint and application on Appellants; that the President alleged no basis justifying preliminary relief; that the district court denied Appellants reasonable opportunity to respond; that the court’s grant of a “directed verdict” was error; that the Sovereign Immunity Act deprived the court of jurisdiction over the injunction proceeding; and that the court misapplied the Chapo test or the test was, otherwise, not controlling.
This appeal comes to us at a critical time of great disharmony between the branches of the Navajo Nation government that is evident to the Navajo People. The leadership of the branches have been in conflict over governmental reform, and unable to sit down with each other and talk things out for almost two years, with the Executive and Legislative Branches *53 each claiming interference with their inner operations and the very structure of their respective authority.
There is obviously a great difference between the branches as to what is the source of authority to govern on the Navajo Nation. The underlying difference is about whether the authority to govern comes from the Council or the People. The Council has become so intransigent in its position that it now purports to have authority to enact a new statute that would reduce the discretion of our courts to question the sources and complexion of our laws and governmental authority.
Our People who remember our previous governmental unrest in 1989 have said that we have entered a similar, and more prolonged, period of turmoil in our history. While the 1989 turmoil involved only the Council and its internal officers, the present crisis now involves separate, coordinate branches. The adversarial process is a system of absolutes—there is a winning side whose claims may be enforced, and a side that does not win. In reviewing this case, due to the governmental role of the parties, we are, in fact, sitting in review of governmental powers.
II
PRELIMINARY MATTERS
This case between the Executive and Legislative Branches presents preliminary questions of jurisdiction (application of the Sovereign Immunity doctrine), the public interest in balancing the powers and rights asserted by the Executive and Legislative Branches (application of the Separation of Powers doctrine and Due Process under the Navajo Nation Bill of Rights) and the ultimate issue on the merits.
We have said that the primary principle that informs this Court’s interpretation of procedural due process is K’é, which fosters fairness through mutual respect, and requires that an individual is fully informed and provided an opportunity to speak. Atcitty v. The District Court for the Judicial District of Window Rock, 7 Nav. R. 227, 230 (Nav.Sup.Ct.1996); and Fort Defiance Housing Corp. v. Lowe, 8 Nav. R. 463, 475, 5 Am. Tribal Law 394 (Nav.Sup.Ct.2004). In any dispute between the Navajo Nation leadership that is brought before our courts, we will consider and apply k’é as the primary principle under Diñé bi beenahaz’áanii, which is the Fundamental Law of the Navajo People. K’é is the high standard which the People hold our leadership in their enactments and exercise of powers during the period they hold Office, in service of the Navajo People who have chosen them, and in dealings with each other.
As we begin examining the doctrines and principles applicable to this case, we state uneategorically that the courts will not become entangled in the political maneuvering that we and the People are now observing. The courts will take its proper role-that of an independent decision—maker which has been summoned by the branches and the People to move this dispute forward and bring it to an end with a final resolution consistent with our teachings, values, principles, and tradition.
Ill
JURISDICTION
Appellants contend that the district court lacked jurisdiction under the Navajo Nation Sovereign Immunity Act (the Act) because Appellees failed to send a timely Notice of Intent to File Suit, which is a “jurisdictional condition precedent” under the Act. This means that in any matter covered under the Act, the condition must be complied with as a matter of law before the court may hear the matter. The rules *54 of the Navajo Nation Courts do not, otherwise, require the filing of such a notiee. There is no dispute that the notice was not timely filed under the terms of the Act.
Appellees and Amicus contend that the Act was never intended to apply in internal litigation for injunctive relief by and between coordinate governmental branches. If their position is correct and the Act does not apply, then Appellees need not comply with the Act for this action to proceed. We look to the language of the Act itself to see if the intent on this issue may be clearly inferred. If a plain reading of the statute does not provide sufficient clarity, we will apply the following rule of construction: we will see if the language of the statute permits a reasonable person to make a “necessary inference,” meaning an inference “which is inescapable or unavoidable from the standpoint of reason.” Black’s Law Dictionary 716 (6th ed.1991).
The purpose and intent of the Act is “to balance the interest of the individual parties” while protecting “public funds and assets, and the ability of [the Navajo Nation] government to function without undue interference.” 1 N.N.C. § 554(A). It is plain from this language that the Act covers suits for damages to come out of the Navajo Nation treasury. It is less plain whether the Council sought to use the Act to limit access to the Navajo Nation courts by the Navajo Nation government itself in actions filed by itself for declaratory or injunctive relief.
We are now presented with a lawsuit between two branches of the Nation for injunctive relief and squarely presented with the question of whether the Act is to be applied in such a lawsuit. This issue is a matter of first impression.
In 1989, we held in Plummer et al v. Judge Harry Brown, 6 Nav. R. 88, 91 (Nav.Sup.Ct.l989)(Plummer II) that the Act applied in a matter involving the Council and its Chairman seeking injunc-tive relief. Since then, our government has been restructured into a three-branch system. The Act itself has been amended four times since government restructure and Plummer II. Since Plummer II, procedures and “jurisdictional conditions precedent” have been added that must be fulfilled by all plaintiffs who intend to file suit against the Navajo Nation, without exception. 1 N.N.C. § 555, as amended. The procedures require all notices of intent to sue, summons, and complaints against the Navajo Nation[1] to be served on “the President and Attorney General of the Navajo Nation.” 1 N.N.C. §§ 555(a)-(c), as amended. A Plaintiff against the Navajo Nation shall serve the President and Attorney General (AG) exclusively in all suits, without exception.
In this action initiated by the President, the Act’s service requirements and jurisdictional conditions precedent resulted in chaos. In order to initiate suit, the President mailed a Notice of Intent to himself and the AG as the sole agents for service for the Navajo Nation. Respondent Council was not directly served because the Act did not so require. The AG, claiming conflict, pleaded no duty to serve the Complaint and Summons on Appellants. Appellants’ Brief-in-Chief Statement of Facts, para. 27. The President received Plaintiffs copy directly from the clerk of the court and, therefore, did not serve himself as the Act required. Appellants argue that these absurd outcomes require *55 dismissal of Appellees’ suit due to noncompliance with the Act.
The confusion resulting from the Act’s requirements in this situation is evident from the record. Clearly, no provision for service was made in the event the Executive Branch sued the Council. A survey of all Council resolutions establishing and amending the Act show no consideration of such suits was made by the Council. We must necessarily infer that the Act, as amended, did not contemplate internal Navajo Nation suits in which the Executive is also Plaintiff against the Navajo Nation.
We find jurisdiction.
Our analysis must continue a little further. The crisis the Navajo Nation government is presently experiencing gives us cause to be concerned that the principle of separation of powers may not be properly respected if the Council seeks to amend the Act to address internal litigation. Under our system of checks and balances, the various branches must not be expected to be the judges of their own powers.
We take judicial notice that sovereign immunity between coordinate branches has never been inferred by the federal courts, which hear numerous inter-branch constitutional challenges out of a duty to resolve issues arising between the coordinate branches.[2]
The courts of the Navajo Nation were created by statutes enacted by the Council, and the Council would be the first to say that they can modify and repeal any statute. However, especially given the lessons of the present crisis, checks and balances is a fundamental principle of a government of separate functions that may not be abridged by the Council.
We find that the governmental entities of the Navajo Nation must have full access to the courts of the Navajo Nation when seeking non-monetary remedies or redress in any matter relating to governmental functions. Government entities must have access to our courts without undue restraint and on such terms and conditions as may be available to any individual person seeking relief for private disputes through our courts. Governmental entities’ access to our courts may, further, be given priority in our courts as circumstances dictate, due to the need for our government to resolve disputes speedily and return swiftly to serving the Navajo People in the spirit of k’é. The Council is left to specifically determine if and how to amend the Act, subject to these conditions.
IV
STANDING
Appellants contend that by filing the case below using in-house and private counsel, Appellees’ violated Title II of the Navajo Nation Code because “the Attorney General’s authority to prosecute lawsuits on behalf of the Nation is exclusive.” Appellants’ Brief-in-Chief Argument, Section B (ref. 2 N.N.C. § 1964(A) and (C)). Appellants appear to be claiming that Appellees lack standing to pursue this suit.
Standing goes to the Court’s subject matter jurisdiction and may be raised *56 at any time. Gudac v. Marianito, 1 Nav. R. 385, 394 (1978); Lee v. Tallman, 1 Nav. R. 191, 192-3 (1996). The Navajo Nation Code confers standing on the AG. Section 1964(C) provides in relevant part: “The Attorney General shall defend and initiate all actions, including appeals, in which the Navajo Nation is a party.” The issue before the Court is whether the AG as the Chief Legal Officer of the Navajo Nation has exclusive standing, as Appellants assert, to defend and initiate internal litigation on behalf of the Executive Branch.
Section 1964 sets forth all the AG’s powers, responsibilities and duties in (A) through (I). The AG’s standing may be delegated under certain circumstances— when the AG lacks “available resources,” Section (B), when the AG retains private counsel to handle “any particular matter ... as he deems appropriate,” Section (E), and when the AG determines he/she is “disqualified,”[3] Section (H). However, the AG’s approval is not needed by all Navajo Nation entities in all circumstances where legal services are sought from counsel other than the AG. The AG’s standing is not exclusive as to Chapters in all matters, while the branches are limited only in external litigation. As Section (C) provides:
No division, program, enterprise, or other entity of the Navajo Nation government shall retain or employ legal counsel except as may be approved by the Attorney General. The branches shall not retain or employ legal counsel for external litigation except as may be approved by the Attorney General. (Emphasis added). Navajo Nation Chapters may employ their own counsel, subject to available funds, under the terms and conditions approved by the Chapter membership.
Section 1964, read in the sum of its parts, is ambiguous as to what conditions governmental entities need to fulfill before proceeding to defend or initiate suits, and how exactly the Nation’s interests are to be defended upon the AG’s non-representation. For example, must the AG determine disqualification in all such suits; what if the AG only lacks resources but is, otherwise, not disqualified; may an entity which lacks resources require the AG to hire legal counsel on their behalf if the AG is disqualified, and if not, who then defends or presses the Nation’s interests; do the AG and Navajo Nation Chapters share standing? Most relevant to this suit, if branches are prohibited from retaining or employing legal counsel for external litigation without the AG’s approval, is the inference then that the branches and the AG share standing in internal litigation, or is standing exclusive to the branches in internal litigation?
When a statute is ambiguous the court relies on rules of statutory construction, including the principle that the statute be read as a hamwnious whole. Kisoli v. Anderson Security Agency, 8 Nav. R. 724, 6 Am. Tribal Law 692 (Nav.Sup.Ct.2005) (emphasis added). Reading Section 1964 as a whole, we must find that the Executive Branch shares standing with the AG in internal litigation and need not require the AG’s approval, disqualification, or declaration of lack of available resources in order to retain and employ legal counsel for internal litigation.
V
RESOLUTION CJA-08-10
The remaining issues normally involve our consideration and application of *57 common law precedents and Fundamental Law. However, Resolution CJA-08-10 The Foundation of the Diñé, Diñé Law and Diñé Government Act of 2009 was enacted on February 23, 2010 while this case was pending, and this Court requested briefs from the parties and amicus on its application in this case. We must first resolve what bearing CJA-08-10 has on this case as it purports to prevent the consideration of Fundamental Laws by our courts that are not duly adopted by the Council. CJA-08-10 may nullify common law precedents and have a profound effect on finality in this case and other pending cases.
An intensely divided atmosphere exists today between the branches. The traditional role of the courts in resolving disputes is to bring finality to the issues before us, correct the imbalances, and bring all parties back to hózhq. T’áá bee hózhq ná-hoodleet. The operative application of CJA-08-10, and its validity and legal effect must be clarified.
Appellants have submitted in their briefs that this Court has no reason to review CJA-08-10 as it does not apply to pending cases. However, by its own terms CJA-08-10 became effective immediately upon the Council’s override of the President’s veto, Resolution CJA-08-10, Section Three, Effective Date. While Appellants argue in their brief that the law' was not intended to apply to cases begun prior to its enactment, the Navajo People have received the opposite impression and have believed in the law’s immediate effect.
The Appellants also insist that all CJA-08-10 does is remove the court’s “mandatory” duty to use Fundamental Law in the interpretation of statutes while permitting the courts to continue using Fundamental Law, but this is not how the recitals portion of the resolution is worded. The result is confusion among the People and in our courts.
Resolution CJA-08-10 purports to restrict the courts to using only statutory laws, and prohibit the courts from considering and applying Fundamental Law, Id., Section Two, § 203(E) and § 207(C). It purports to “enact” the Fundamental Laws of the Navajo People. It establishes the Council’s own enactments as Fundamental Law, Id., Section Two, § 202, and further establishes that the Fundamental Law is whatever the Council says it is by empowering the Council to change the embodiment of what is Fundamental Law and the terms of CJA-08-10 itself from time to time as the Council deems necessary, Id., Section Two, S 207(E). The Council has insulated these and all of its terms from judicial review, Id,., Section Two, §§ 207(D), requiring that any dispute over its terms be resolved through consensual peacemaking, Id., Section Two, §§ 207(D). Yet it asks to be read only as “guiding principles,” Id., Section Two, § 200(A), with no superseding effect on other statutes, Id., Section Two, § 200(B). The law’s supplemental effect on the meaning of other statutes is ambiguous. Additionally, as the Council has given itself the authority to change the terms of CJA-08-10 at any time without asking the People, the provisions that this law should be read only as “guiding principles” with no superseding effect on other statutes are subject to change at the whim of the Council.
We first hold that the Council may not insulate nor exclude any statute, policy or regulation from judicial review. CJA-08-10 is a necessary subject for judicial review in that it purports to limit and control the judicial process. The Navajo Nation Bill of Rights, by its own terms and necessary implication, calls for judicial review to decide whether another law or an act of the Navajo Nation Government is void because of a violation of fundamental rights. Bennett v. Board of Election Su *58 pervisors, 6 Nav. R. 319, 323-324 (Nav.Sup.Ct.1990). Judicial review by tribal courts of Council resolutions is mandated by the Indian Civil Rights Act, and is delegated to the Navajo Nation courts by the People through the Council. Halona v. MacDonald, 1 Nav. R. 189, 206 (Nav.Ct.App.1978).[4] We said in Halona:
The style and the form of problem-solving and dispensing justice has changed over the years but not the principle. Those appointed by the People to resolve their disputes were and are unquestioned in their power to do so. Whereas once the clan was the primary forum (and still is a powerful and respected instrument of justice), now the People through their Council have delegated the ultimate responsibility for this to their courts. That is why 7 N.T.C. 133 is so broadly written.
Id. at 205.
Our choice of law statute at 7 N.N.C. § 204 requires us to “utilize Diñé bi beena-haz’áanii (Navajo Traditional, Customary, Natural or Common Law) to guide the interpretation of Navajo Nation statutory laws and regulations.” In Judy v. White, 8 Nav. R. 510, 5 Am. Tribal Law 418 (Nav.Sup.Ct.2004), we presumed that statutes are enacted for proper purposes, and have said that we do not examine the motivation behind legislative acts unless we have found that the act was not proper and legal. Id. at 528, 5 Am. Tribal Law 418. However, the instant case, involving division and allegations of partisanship and self-interest by and between governmental branches, presents a set of circumstances not previously contemplated by this Court. We will follow the lead of the federal courts when dealing with matters concerning fundamental rights, and consider legislative purpose, including the surrounding circumstances, documents generated during the legislative process, and the statute itself in all its parts.[5]
We further apply the principle of íishjá-ni ádoolníü which “mandates that laws must be clear so that they may be understood.” Milligan v. Navajo Tribal Utility Authority, No. SC-CV-31-05, 6 Am. Tribal Law 731, 734-35 (Nav.Sup.Ct. March 23, 2006). In Bennett, supra, we adopted a bilagaana due process rule regarding the invalidity of vague statutes when a political liberty right is impacted; we stated that a statute “will be deemed invalid under due process of law when they are so vague and uncertain that men of common intelligence must necessarily guess at their meaning.” Id. at 326 citing 1 Antieu, Modern Constitutional Law § 7:20 (1969) (quoting Connolly v. General Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1962)). Resolution CJA-08-10 impacts the liberty right of the Navajo People in determining the basic principles under which they live and are governed.
It is an elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute. CJA-08-10 is highly ambiguous when read as a whole, with its terms capable of multiple conflicting meanings and application. It purports to be law, and not-law, at the same time. It includes Council enactments as Fundamental Law, yet removes Fundamental Law from use by the courts. People of common intelligence must necessarily differ as to how the *59 terms are to be applied, or even whether CJA-08-10 is or is not law. The language in CJA-08-10 fails to satisfy ííshjání ádoolnííl because it is not clear and not readily understood as a whole.
The recitals, minutes, and surrounding circumstances shed light on legislative intent. The minutes of the January 2010 Council Session show that the Council enacted CJA-08-10 because it believed their “expressed law” was being disregarded. Id. p. 1-2. The Council made a statement in the recitals section of CJA-08-10 that “it is inappropriate for Navajo Nation governmental entities or officials to dictate, coercively administer, and attempt to enforce a nonconsensual observance of the Diñé Life Way, including through the imposition of decisions and judgments developed in adversarial proceedings in nontraditional judicial forums by government-appointed judges and justices in the Judicial Branch.” Id., Findings Clause (D). However, the Council makes no specific findings and mentions no reports. It is the settled expectation of the People that government actions must be explained. Without specific findings, the purpose of any government action will be questioned. Necessary inferences may be made from the surrounding circumstances. We take judicial notice that the Council has publicly expressed dissatisfaction with a number of recent decisions by the courts that have gone against the Council’s partisan interests, in which the courts have used Fundamental Law. All these cases concern the President’s initiatives to reduce the size of the Council and give the President budget line-item veto.[6]
The totality of the circumstances show that the Council passed CJA-08-10 with the purpose of controlling the type of law that is used in the courts due to the negative impact the use of traditional laws have had on the Council’s partisan interests in recent court decisions. Such partisan use of legislative power is an impermissible legislative purpose that, furthermore, violates the doctrine of separation of powers. The Council may not encroach upon the independence of the Judicial Branch. While a complete and total separation of powers is not possible, encroachment by one branch into the essential powers of another for any reason is impermissible. Neither may the Council re-define the Fundamental Law of the Navajo Nation to include man-made law.
Based on the above reasons, we find Resolution CJA-08-10 invalid.
*60 Diñé bi beenahaz’áanii as acknowledged by the Council teaches that our Diñé leaders are to adhere to the values and principles of Diñé bi beenahaz’áanii. 1 N.N.C. § 203 (2002). Diñé bi beenahaz’áanii are the very foundational laws of Navajo culture. They are not man-made law, and may not be “enacted” by individuals or entities or the Navajo Nation Council, they may simply be acknowledged by our man-made laws. Our elders and medicine people are the keepers and teachers of Dine bi beenahaz’áanii 2 N.NC § 203(G). Amicus Mr. Arthur states in his brief, ‘The Fundamental law represents the cumulative knowledge which has accrued to the Diñé from the time of creation until the present. It represents the lessons which were learned as the People traveled through the underworlds and emerged into the glittering world as the bila’ashdla’ii. It includes the conflicts that took place before the emergence, and how they were resolved, and conflicts that took place after the emergence, and how they were resolved. It includes what has transpired since the creation and the lessons taught to the People by the Diyin Dine. No single person knows all of the Fundamental Law but every single one of the Táá, Diñé knows some of it.” Amicus Curiae Brief of Eddie J. Arthur, p. 18.
We have stated that “there is a Navajo higher law in fundamental customs and traditions, as well as substantive rights found in the Treaty of 1868, the Navajo Nation Bill of Rights, the Judicial Reform Act of 1985, and the Title Two Amendments of 1989. The power of judicial review flows from these principles and documents, and they set the boundaries for permissible action by the legislative, executive, and judicial branches of the Navajo Nation.” Bennett, supra at 324. The Legislative Branch may acknowledge, not independently “enact” Fundamental Laws. Similarly, the Judicial Branch may consider and apply Diñé bi beenahaz’áanii in court decisions.
Amicus Mr. Arthur informs the Court that “in 2007, as the Fundamental Law was being questioned by [the Council], Hada'asidi or ‘the Vigilant Ones’ was formed with the mission statement *We must be vigilant to insure that the Navajo Nation Government is transparent in service to its people by using Policies and Laws intended to form good Governance. In this Governance, we will assert our traditional and cultural values as the Paramount Law of the People, our Fundamental Laws as prescribed under the Navajo Nation Code, Title 1, Chapter 2.’ ” Amicus Curiae Brief of Eddie J. Arthur, p. 18. The People must be vigilant with its leaders, who are after all imperfect beings, and must fully exercise their reserved rights and powers, ensure a well-structured government that will withstand the moral failings of human beings, and ensure our society is in accord with our Fundamental Laws.
VI
GOVERNMENTAL STRUCTURE
In asserting various positions in their briefs, Appellants have claimed that that there is no separation of powers doctrine on the Navajo Nation because “there is no written Constitution,” therefore “no public agreement.” Appellants’ Response to Ap-pellees’ Supplemental Brief, p. 18. Appellant further informs the Court that
Navajo common law cannot supply a rule of decision about how to allocate lawmaking power between the Council and the courts because the three branch government is borrowed. It is not indigenous to historical Navajo political culture ... Navajo common law ... *61 cannot provide a rule of decision to a political model that it does not know.”
Id. at p. 18-19 (emphasis not added).
Appellants finally assert that, whatever the historical circumstances, “the Council is in fact the original governing body of the Navajo Nation.” Id. at 16.
Appellants are the Speaker and Council of the Navajo Nation asserting, in the context of this lawsuit, that the Council is the absolute source of governance for the Navajo People, that there is nothing indigenous about the three-branch government, and that traditional laws of the Navajo People have no relevance in modem governance. Quite frankly, this Court is startled, bik’ee áttyéés, by the propositions being advanced by our Navajo leaders; that the Speaker and Council, the elected leaders of the Alqq/j\” Nmt’ájí Nahat’á component of our government, believe that the government that they have been entrusted with really is not a Diñé government, and that Diñé values, principles, laws, tradition and culture have nothing to do with our government structure. It is, indeed, sad to hear from our own leaders such a belief and how they propose that such a government must be maintained. It shows disrespect for oneself and the People they represent. When we hear this, we are reminded of the terrible history of colonialism and its terrible impact on all Indian Nations. Our leaders of the Legislative Branch apparently believe that colonialism has succeeded with the Diñé. The Court strongly disagrees that there is nothing indigenous to our government. The Court is obligated to respond in a blunt manner to such an outrageous proposition.
We take judicial notice that the Navajo People have long resisted the imposition of a written Constitution in the mold of the U.S. Constitution. The notion of a piece of writing, even if popularly “enacted” to serve as the higher law, has been anathema to our People for whom Dim bi beenahaz’áumii, the Fundamental Laws, are immutable as given to the Diñé by Nohookáá Dine’é Diyinii, the Holy Ones. The history of Navajo resistance in the twentieth century to such a document is well-recorded. However, we take judicial notice that the written Constitution of the United States is only one aspect of the Anglo fundamental laws and is not the only source of Anglo higher law.
The U.S. Constitution is a short document, with rights not enumerated reserved to the American people by the plain wording of its preamble and by the 9th Amendment. Over time, the Constitution has needed to be given flesh, bone and muscle by the federal courts through reference to multiple sources of Anglo fundamental laws, including custom, natural Anglo law, enacted law, and reason.
We take judicial notice that many ideas and processes that are accepted as a needed part of United States government have come about through custom and precedent, and are so ingrained into the U.S. system that many do not realize that they are neither statutes nor provisions of the Constitution.[7]
*62 As a tribal Nation, we have asserted our inherent sovereignty—our historical sovereignty, our language, culture, our value system, and our legal heritage based on unwritten Fundamental Laws that form the very foundation of who we are as Diñé.
We have said before that participatory democracy does not come from the non-Navajo nor does it come from the Council. It comes from a deeper, more profound system of governance: the Navajo People’s traditional communal governance, rooted in the Dine Life Way. Judy, supra at 531, 5 Am. Tribal Law 418. The ideal Navajo Nation government is not one that is governed by perfect individuals, but which is oriented toward the public interest and recognizes fully that the power to govern comes from the People, Hózhóójí dóó Hashkéejí
We take judicial notice that foreign structures of government have been imposed on the Navajo People since Hwééldih. However, our present three-branch form of government was established by our Council itself after an episode of serious governmental malfeasance in order to benefit the Navajo People, to ensure that such abuse is not repeated. This present system was established in 1989 by Resolution CD-68-89 in response to turmoil in the Navajo Nation government (Title II Amendments). At the heart of the turmoil were allegations of self-dealing, fraud, and receipt of kick-backs involving the Council leadership of the Navajo Nation. Resolution CD-68-89 shows that the Council believed that a model of government with separation of powers would provide checks and balances that was missing from the collective governing model of the time. The Navajo Nation separation of powers doctrine is implicitly embedded in the entire framework of the Title II Amendments that define the substance and scope of powers granted to the three branches of Navajo Nation government. The separation of powers doctrine requires that each branch of government be permitted to exercise its duties without interference from the other two branches of government. Essential in the separation of powers principle is an independent judiciary, able to freely critique government using full powers of judicial review.[8] The Council determined that the unitary governing model of the times
allowed too much centralized power without real checks on the exercise of power. Experience shows that this deficiency in the government structure allows for, invites and has resulted in the abuse of power.

Navajo Nation Council Resolution, No. CD-68-89, Whereas Clause 2 (December 15, 1989).

The Council made a decision that the Navajo Nation government cannot have *63 concentrated power, and the government was thereby split into branches. The Office of the President was established, and at the same time, the Council also provided for term limits on the President, 2 N.N.C. § 1002(D). The Council’s conclusion that term limits was necessary also sprang from the governmental crisis of the times in which the Chairman had already served three terms. There are no term limits on the Speaker of the Council, as the Speaker is chosen by Council delegates and this an internal Council issue.
A shared leadership in which each leader performs separate functions in a proper way for the public good is an intrinsic part of our Navajo history. “Separation of functions is a concept that is so deeply-rooted in Navajo culture that it is accepted without question. It is essential to maintaining balance and harmony.” Sloan, supra at 167. N.N.C. §§ 200 et seq. acknowledges that our Fundamental Law is the premise for our principles of separation of powers and checks and balances. Section 203 acknowledges that there are four components to Diñé governance—Hózhóójí Nahat’á (Executive Branch), Naat’ájí Nahat’á (Legislative Branch), Hashkééjí Nahat’á (Judicial Branch), and Naayee’jí Nahat’á (National Security Branch). They each have their functions. They are all naat’aaniis of equal stature, from the People’s point of view. These components are expected to work cooperatively and cohesively together. Three of these components are reflected in the current three branches. The fourth component, the Protector/Warrior, is not established as a branch, but this component is reflected in those who protect us, e.g. the police, the fire department, and the rangers.
* * * *
The laws, culture, and value system of the Navajo People have their genesis in the Journey of the Diñé from time immemorial to the Emergence into this world. The People are taught early on about the role and responsibilities of a leader and how they are selected. Today, we are again involved in a dispute about leadership and authority, naat’áanii haa sah has liligi ham. There is a well-known episode from our Emergence that tells us how a dispute came to be and how it was resolved. The episode began when a question arose as to who would be selected as leader.[9]
A group of the People nominated the wolf Mq’iitsoh and they talked about his qualities, that he would protect the People so that we would come to no harm, and he had powerful words and connection to the Holy People. Another group nominated the bluebird Dólii, that he was compassionate and had qualities of nurturing, which the People need because that’s the way people grow. Yet another group nominated the mountain lion Náshdói'tsoh because he was a hunter, so the People would never go hungry, so it was about survival. Finally, the last group nominated the hummingbird Dah yiit\hi, who was swift and would go from plant to plant bringing back pollen, and the pollen represents spirituality and reverence which the People need to have honor for one another.
The People couldn’t agree to choose one leader among those nominated, they each wanted the one each nominated. Finally, they resolved to send the wolf towards the East and bring back something for the People that will sustain life. The bluebird *64 was sent to the South, the mountain lion was sent to the West, and hummingbird to the North. The People waited and waited and no one came back. They kept looking into the four directions for their leader until one day, the People looked into the North and there was something white that was moving, and it was the dawn moving towards them. They saw it was the wolf, who had brought back the' dawn Ha-yoolkáál as his coat, which is thought Nit-sáhákees, white shell which is used in mineral offerings, the white corn for food, and songs Sin dóó Tsodizin. At midday, the People looked into the South and there was something blue that was moving, and it was the blue sky moving towards them. They saw it was the bluebird, who had brought back the blue sky Yádihü Niho-deetl'iizh as his coat, which is planning Nahat’á, turquoise which is used in mineral offerings, the blue corn for food, and wise words Yódí dóó Niitl’iz Saad. When the sun set, the People looked into the sunset and there was something gold that was moving, and it was the mountain lion moving towards them, who had brought back the gold of the sunset Nihotsooi as his coat, which is Una life, abalone shell which is used in mineral offerings, yellow corn for food, and birth and development Oochíü dóó anoohséél. Finally, after dark, the People looked into the North and saw all kinds of different colors moving into each other, and it was the hummingbird moving towards them, who had brought back the night Chahalheel as his coat, which is Sihasin hope, jet which is used in mineral offerings, squash for food, and reverence Hodilzin.
The People were awed as each of these were brought out. In spite of what each group had previously assumed was vital to sustain life, the People felt that Mq'iitsoh, Dólii, Náshdói'tsoh and Dah yiitfhi each brought back a crucial element for life, therefore all would be leaders and must work together to sustain life. The People decided to make all of them leaders. We re-tell this story to emphasize that, since beyond recorded time, the People have understood the separation of functions of leaders, and that in order to survive as a People, there must be collaboration and coming together both in the community and in the leadership chosen by the People to pool skills, resources and characteristics. There is no supremacy of any one portion of the day over another, therefore there is no greater skill, resource, characteristic, or leader over the others. The People choose and challenge their leaders to give something useful and valuable to the People in equal parts, and the leaders provide.
With this episode, Fundamental Law was established that there should not be concentrated power. There are different components of government that must work together. The modern system which reflects those components must work together.
We have seen in the last few decades what occurs when, instead of thinking of the best interest of the People, one of these components tries to assume a superi- or position. Our experience in 1989 and our present experience in 2010 shows the extremes of what may occur. Because of this, there has always been a need for a disciplinarian, which is the governmental component that the courts represent, Hashkééjí Nahat’á. We have said in Sloan, supra:
[Cjoncerns about abuse of power cannot be adequately resolved by the separation of powers doctrine alone. Checks and balances are equally important in the operations of government. Checks and balances promote accountability within each branch by preventing abuses of discretion and power. In 1989, the *65 Tribal Council recognized that checks and balances must exist between the branches of the government. Preamble of Navajo Nation Council Resolution No. CD-68-89, Par. 8. While the three branches remain separate, they exercise certain review function over one another. These checks and balances are evident throughout the Title II Amendments ... Checks and balances are as fundamental to the Navajo Nation government as is the doctrine of separation of powers.
Id. at 169.
Our Diñé history is long, even extending beyond recorded time, and in our journey the Diñé were instructed that we will always struggle with the negative of human behavior, and we know the four monsters and their consequences (poverty, lice, sickness, hunger) that were left in our world by the Holy People, and with them greed, envy, jealousy, and sloth.[10] We must remind ourselves of this history to come to terms with the modern challenges that face us as a People. Our government, run by human beings, our relatives, is susceptible to internal decay and imperfect government. The context and language of CD-68-89 show the urgency of the Council “to meet the immediate needs of the Navajo People for a more responsible and accountable government.” Resolution No. CD-68-89, Whereas Clause 7. In the midst of the crisis of the times, the Council acted to curb its own power and create a structure that would halt a sense of internal difficulties in our government and that would endure as a bulwark against corruption “until the Navajo People decide through the Government Reform Project the form of government they want to be governed by.” Id., Whereas Clause 8. We have called the Title II Amendments our “organic” law. Judy, supra at 538, 5 Am. Tribal Law 418. To emphasize that the Title II Amendments of 1989 were intended to be left intact until the People’s decision, the Council further repealed and declared “null and void rules, regulations, and laws or parts thereof which are inconsistent with the provisions of Title Two (2), Navajo Tribal Code, as amended herein.” Id., Resolved Clause U. Resolution CD-68-89 Whereas Clause 8 and Resolved Clause 4 are found in the first 4 pages of the widely distributed “blue book” or naltoos dootVizhi, containing the Title II Amendments.
We acknowledge and hold that the Whereas and Resolved Clauses of CD-68-89 operate today as a solemn promise by the Council to the People, intended to bind the hands of future Councils. They embody the commitment of the Council to a structure they hoped and believed would serve the People effectively until the People themselves might find a path to a better way.
We are not unmindful that this Court has previously held that the clauses in a resolution do not carry the weight of law as they do not contain “the required over-striking and underlining.” See Judy, supra at 538, 5 Am. Tribal Law 418. When convinced of former error, we must exercise our power to reexamine the basis of the previous decision. The Judy Court applied the law of statutory construction to clauses in a resolution, and did not hesitate in breaking the link between the purpose, as stated in the recitals, and command, as codified. We state today that logic and fundamental fairness demands that there be consistency and harmonious linkage between the recitals and the statute enacted. Words are sacred, and the Navajo People have the right to keep the Navajo Nation Council to the whole of its words, not *66 simply a portion thereof See Wagner v. Tsosie, No, SC-CV-01-07, 7 Am. Tribal Law 528, 583 (Nav.Sup.Ct. May 14, 2007).
All branches of the Navajo Nation government are accountable to the People. The Council recognized in Whereas Clause 8 that the People are the source of Navajo Nation governmental authority. They cannot speak this in the recitals portion of a Resolution which is read by the People, then place conflicting provisions in the complex codified section, which is read mostly by lawyers and officials. In such an event, the provisions that conflict with the policy as stated in the recitals portion of the resolution must give way. Hazaad jidisin, words are sacred in Navajo thinking. See In re Two Initiative Petitions Filed by Shirley, No. SC-CV-41-08, 7 Am. Tribal Law 628 (Nav.Sup.Ct. July 22, 2008) citing In re Grievance of Wagner, No. SC-CV-01-07, 7 Am. Tribal Law 528, 533 (Nav.Sup.Ct. May 14, 2007) (“The Diñé People will keep [a] delegate to his or her words.”). A leader must always speak the truth and has a responsibility to communicate it to the people, Naat’áanii éí t’áá’aníígóó yálti’ doo t’óó áníida éí binii-naa éí bidine’é yü ahídéélt’i’go yichi’i" yálti’ dóó yü ahidiits’a’. If words are said, they are meant.
As we hold today that the Council through the recitals of the Resolution CD-68-89 made a solemn compact with the People that the structure will be temporary and left it up to the People to choose the final structure of government, we reject Appellants’ argument that there is no separation of powers on the Navajo Nation. The doctrine is a fundamental principle of Navajo Nation government through the Title II Amendments. Eriacho v. Ramah Dist. Ct., 8 Nav. R. 598, 602, 5 Am. Tribal Law 469 (Nav.Sup.Ct.2004) citing Sloan, supra at 168.
* * ⅜ ⅜
The recitals in Resolution CD-68-89 operate as a promise. Through the Title II Amendments, the Council acted to stabilize Navajo Nation government in face of corruption and chartered a course for further reform and enhancements. The Council recognized that the power over the structure of the Navajo government “is ultimately in the hands of the People and it will look to the People to guide it.” In re Two Initiative Petitions Filed by President Joe Shirley, Jr., No. SC-CV-41-08, slip op. at 9 (Nav.Sup.Ct. July 18, 2008). As we noted earlier, CD-68-89 provides for a Government Reform Project through which the People would make known what kind of government the People want to be governed by. Resolution CD-68-89, Whereas Clause 8; Resolved Clause 7 & 11; codified sections 970-978. Pursuant to this promise, the Commission on Navajo Government Development (Commission) was established with quasi-independent authority.
We take judicial notice that the People have, in fact, taken substantial steps to choose their government through this Commission. In October 2002, the Commission met with representatives from each of the 110 chapters in a week-long convention at Red Rock State Park. As a result of the Convention, the People, through the Commission, proposed amendments to local and central governance and election law that they believed vital to governmental reform. The proposed amendments to Title II included the establishment of an Ethics Commission within the Legislative Branch with powers to hear ethics in government cases and sponsor legislation to govern ethical conduct of the Navajo Nation Government, prohibiting the Council from spending down discretionary funds below a certain amount, from waiving laws, changing the designa *67 tion of the Council from the “governing” body to the “legislative” body of the Navajo Nation, giving the President line-item veto power over certain budget items, permitting the President to convene special Council Sessions when in the public interest, and—most importantly—in order to make it plain that powers not enumerated are reserved to the people, changing the wording of 2 N.N.C. § 102(B) and (C) as follows:[11]
§ 102 Powers; Composition ⅜ ⅜ ⅜ ⅜
B. All powers not delegated authorized, to the Navajo Nation Council by Title 2 are reserved to the Navajo.Nation-Council people.
—The Navajo Nation Council shall superase all powers not delegated.
However, the Council did not address any of the above governmental reform measures presented to them by the People through the Commission. Instead, the Council proceeded to dissolve the quasi-independent Commission in 2007, establishing in its place the Office of Navajo Nation Government Development supervised by the Speaker, and served by an Executive Director appointed by the Speaker and serving at the pleasure of the Council. Resolution CO-37-07, October 18, 200j. By their actions, the Speaker and Council failed to keep the promises made to the People in CD-68-89 when the Title II Amendments were made and failed to carry out the People’s mandate. The Council has a duty to act on the People’s recommendation. If the Council refuses to act, it is not inappropriate for other governmental entities to press the People’s interests and hold the Council to its promises made in Resolution CD-68-89.
We note that in the post-1989 era, the Council did take some steps in furtherance of recognition of the retained governance of the People by enacting the Local Governance Act, Resolution CAP-Si-98 (April 20, 1998) and the acknowledgement of Diñé bi beenahaz’áanii, Resolution CN-69-02 (Nov 8, 2002), which added to the strengthening of the Nation by revitalizing and shaping the government in conformance with Fundamental Law. It was only eight years ago that Appellants explicitly acknowledged that this government which we are still developing is based on Diñé Fundamental Law. However, the Council strayed from the course that had been set by dissolving the Commission on Navajo Government Reform, failing to consider the People’s recommendations, failing to carry out the People’s mandate, and by the recent amendments in Resolution CJA-08-10 seeking to establish the Council’s enactments as Fundamental Law.
It is a long-standing practice of this Court not to issue advisory opinions based on issues not before us. See Bizardi v. Navajo Nation, 8 Nav. R. 693, 5 Am. Tribal Law 467 (Nav.Sup.Ct.2004). We have adopted a bar on advisory opinions based on future injuries, Bennett v. Shirley, No. SC-CV-21-07, 7 Am. Tribal Law 595 (Nav.Sup.Ct. November 29, 2007), and issues not necessary to the resolution of a dispute, Begay v. Navajo Election Admin., 8 Nav. R. 241, 4 Am. Tribal Law 604 (Nav.Sup.Ct.2002). However, in an action for injunctive relief such as the instant case, it is incumbent on the courts to determine the duties, rights, obligations, and status of parties to prevent harm, or further harm from occurring without making an award of damages to any party.[12] We hold that the courts may issue clarifying *68 opinions within the following limiting principles: (a) a clarifying opinion may be issued sua sponte or at the request of a party; (b) the opinion may be made only in connection with a present suit for declaratory or injunctive relief; (c) there is an allegation of future injury; (d) the clarifying opinion is needed in order that finality may be achieved in the matter before us; and (e) there is reasonable apprehension of an imminent suit in which large costs may be incurred and which impacts the public welfare.
We find that a clarifying opinion is necessary here, on the issue of the source of governmental authority in order to reach finality in this case, to fend off the likelihood of imminent and costly suits between the branches, and to prevent further injury to our governmental system sure to impact the public welfare.
We affirm the power of the People to choose their form of government. Egalitarianism is the fundamental principle of Navajo participatory democracy. The egalitarian principle is the ability of the People as a whole to determine the laws by which they will be governed. We elaborated on the fundamental principles of the “reserved” power of the People as it pertains to the Navajo government in In re Navajo Nation Election Administration's Determination of Insufficiency Regarding Two Initiative Petitions Filed by Shirley, No. SC-CV-24-09, 8 Am. Tribal Law 240, 244 (June 22, 2009), and so affirm today.
VII
DUE PROCESS
Appellants raise a mixture of procedural and due process issues. They contend that service was inadequate, that the court denied them reasonable opportunity to respond, that Appellee alleged no basis justifying preliminary relief, and that the court granted a “directed verdict” in error.
Without question, the district court was faced with unique and challenging circumstances. For the first time, a Navajo Nation trial court was asked to adjudicate a dispute between the leadership of the Executive and Legislative branches. The Executive Branch had filed an application for an ex parte Temporary Restraining Order (TRO) and Preliminary Injunction under Nav. R. Civ. P. Rule 65 and 65.1. Such actions are “special proceedings” under court rules with different notice and scheduling rules than normal actions. The availability of ex parte TROs on the Navajo Nation under our Rules of Civil Procedure recognizes there are urgent and emergency situations in which the court must act swiftly because of the risk of irreparable harm asserted in such matters. The court uses its discretionary injunctive power to make whole again a party whose rights have been violated. The court may grant a TRO ex parte to maintain the status quo in an emergency until an expedited preliminary injunction hearing; or must otherwise schedule an expedited hearing on the TRO and preliminary injunction.
The status of the parties as governmental entities and the “special proceedings” action filed presented the court with conflicting sets of procedural and due process issues. Because the parties were both Navajo Nation governmental entities, the *69 court must consider the conditions and requirements of the Sovereign Immunity Act which mandate lengthy notice and response time periods. However, because the action filed is a TRO and preliminary injunction action, the entity filing the action (Appellees) has a due process right to expedited proceedings. The court must hold expedited proceedings to look into whether an ex parte TRO should be issued to ensure irreparable harm does not occur or continue to occur.
The procedural elements of the Sovereign Immunity Act relevant to this case are service on the President and the AG by certified mail, a 30-day Notice of Intent as a “jurisdictional condition precedent,” a 60-day return of summons, and a 20-day response period. The essential requirements for a TRO and preliminary injunction proceeding are notice of intent to file a TRO to the party or party’s counsel. The filer of the action must demonstrate his right to a preliminary injunction at the hearing. Otherwise, there are no specific pleading requirements.
We previously held that the Sovereign Immunity Act does not apply in suits by and between the governmental branches. Therefore, there is no need for us to examine the court’s decision for compliance with the Act. We will review the court’s findings for sufficiency in the context of a TRO and preliminary injunction joint proceeding, noting that Appellants urged the district court “to balance the interest of the Petitioners (Appellees) while protecting the interest of the Navajo Nation government in this matter,” Transcript of 12/W09 Proceedings at 163.
Discretion is defined as the ability to act within certain boundaries of rules, principles and customs applied to the facts of the case. While judges have discretion, there are limits to that discretion. Discretion is limited by legal principles and must be exercised in conformity with the spirit of the law and adopted rules, to serve the ends of justice. Smith v. Kasper, No. SC-CV-30-07, 8 Am. Tribal Law 347, 348 (Nav.Sup.Ct. December 2, 2009), citing Sheppard v. Dayzie, 8 Nav. R. 430, 434, 5 Am. Tribal Law 374 (Nav. Sup.Ct.2004).
A. Notice
In order to comply with the Act, Appellees sent a Notice of Intent to File Suit to themselves and the AG on December 3, 2009. Nav. R. Civ. P. Rule 65.1(b) required Appellees to send the Notice to Enjoin to the “adverse party or the party’s counsel.” In order to comply with the court rules, Appellees sent a Notice to Enjoin Enforcement of Resolution CO-jl-09 to both the Office of the Speaker and the Office of the Legislative Counsel on December 4, 2009, giving information of Appellees’ intent to file suit on December 7, 2009. Receipt of the notices on December 4 was confirmed. Appellees’ apparent intent was to serve the Speaker directly, and to serve the Council through the Council’s legal advisor. 2 N.N.C. § 961 provides that “the purpose of the Office of Legislative Counsel is to provide legal advice and legislative services to the Navajo Nation Council, standing committees, commissions and boards of the Navajo Nation Council, independent of the Department of Justice.” “Counsel” is defined as “advice and assistance given by one person to another in regard to a legal matter.” Black’s Law Dictionary 243 (6th ed.1991). The court rules for TRO proceedings do not require service on counsel “of record.” Additionally, the AG who is the chief legal officer of the Navajo Nation received notice. The court found that the Speaker and Council received sufficient Rule 65.1(b) notice, and we affirm.
*70 The reeord shows that Appellants failed to appear at the December 9 TRO hearing. The AG was present to inform the court that he could not represent Appellants due to conflict, but because he had not yet informed Appellants in writing as required by 2 N.N.C. § 1964(h), the court required the AG to serve as counsel of record per his statutory duty, until the court received proof that he had sent written notice of disqualification to Appellants. Frank Seanez, Chief Legislative Counsel, submitted a letter informing the court that he was unable to represent Appellants due to the potential of his being called upon as a witness by both sides. The court was concerned that Appellants did not receive actual notice for this hearing, and therefore elected to continue the hearing. Mr. Seanez was physically present as a spectator for part of this hearing and heard the court continue the hearing for 20 days. However, Appellees immediately moved for reconsideration, which Mr. Seanez was apparently not present to hear. Appellees asked the court to issue a TRO pending a hearing, informed the court that the Sovereign Immunity Act did not apply because the enactment of CO-41-09 was outside the scope of Appellants’ authority, and asserted that Appellants’ did receive actual notice. The court took the motion under advisement. We find the court exercised sound judgment in all its decisions at this hearing.
The court granted Appellees’ motion for reconsideration in part and ordered an expedited hearing on December 14, 2009 to address the sole issue of sovereign immunity. The court declined to issue a TRO pending hearing. To make sure all parties received notice, the court ordered that the notice of hearing be personally served by Navajo Nation law enforcement on the Speaker, on the Council through the Office of Legislative Services, and on the AG as statutory counsel of record.
Personal service by Navajo Nation police officers was fraught with difficulties. The Speaker’s Office refused to accept service by a Navajo Nation police officer on December 11 and was eventually served on the morning of the hearing on December 14. The Office of Legislative Services had no staff on hand to receive personal service by the Navajo Nation police officer on December 11 and was eventually served on the morning of December 14. However, there is no formal service requirement under Rule 65.1, only that notice be given. According to Mr. Seanez, the AG hand-delivered the notice of hearing on December 11 to the Office of the Speaker together with a written notice of disqualification. The Office of the Legislative Counsel itself received notice also on December 11. Transcript of 12/W09 Proceedings at 11-12. Mr. Seanez testified that the Speaker and the Office of Legislative Counsel, as counsel to the Council, both received notice three days prior to the December 14 hearing. In addition, the record shows that the Speaker was present as a spectator for part of the December 14 hearing. The court found actual notice, and we affirm.
B. Opportunity to Respond
Appellants contend that the district court failed to give them the opportunity to respond, thereby abridging their due process rights.
The primary principle that informs this Court’s interpretation of procedural due process is K’é. K’é, which fosters fairness through mutual respect, requires that an individual is fully informed and provided an opportunity to speak. However, the opportunity to speak is not unlimited. Where parties have the opportunity to present their case, but fail to do so, the judge may draw a negative inference from *71 that fact. Navajo Nation, Code of Judicial Conduct, Canon Three, No. 2 (1991).
The record shows that, although Appellants did not appear at both the December 9 and the December 14 hearings, the court noted the presence of the Speaker in the courtroom as a spectator for part of the December 14 hearing; the Chief Counsel, Mr. Seanez, was present as a spectator for part of the December 9 hearing, and the Office of the Legislative Counsel (OLC) sent their principal attorney, Tamsen Holm, to the December 14 hearing to attend also as a spectator. The record shows that, prior to December 12, 2009, the Office of Legislative Counsel prepared no less than five legal memoranda that included their analysis of Appellees’ pleadings and had provided these documents to the AG. Notwithstanding Mr. Seanez’ statements of conflict on December 9, at no time did he discontinue providing legal advice to Appellants, and a principal attorney from the OLC aside from Mr. Seanez appeared to be acquainted with the issues and was also physically on hand. We note that the OLC stepped in and represented Appellants when the court resolved to proceed to hear sovereign immunity arguments in Appellants’ absence on December 14. Given the expedited nature of TRO and preliminary injunction proceedings, ample indications of the OLC’s readiness to assist Appellants, and Appellants’ repeated failures to appear, we find the court exercised sound discretion and did provide Appellants ample opportunity to respond.
C. Basis for Preliminary Relief
Appellants assert that Appellees alleged no basis justifying preliminary relief in their pleadings. They assert that Appel-lees were not harmed because the Office of the President continued to function through the Vice-President during Appellants’ absence. Appellants assert that Ap-pellees were not harmed as Appellees suffered no pay loss, continued to use the President’s residence, and was not directly affected by the firing of the President’s staff during Appellees’ absence. However, the court has discretion to require a TRO hearing to develop Appellees’ claims.
Even though TRO and preliminary injunction proceedings may be handled together at a single hearing, they have distinct bases for relief Court rules for a TRO, intended to maintain the status quo, set forth what a TRO itself must contain and under what circumstances it may be issued ex parte, Nav. R. Civ. P. Rule 65.1. Court rules for preliminary injunction set forth what the injunctive order must contain but specify no intent of maintaining the status quo. Id., Rule 65. Otherwise, the rules for both proceeding set forth no specific pleading requirements and leave a lot of room for a case to be developed at hearing.
The record shows that the court focused first on the issue of sovereign immunity. Upon the court’s finding on December 14 that sovereign immunity did not apply due to the Council’s non-compliance with strict statutory enactment procedures in passing CO-41-09, the court proceeded to schedule an evidentiary TRO hearing. However, Appellees immediately moved the court to declare CO-41-09 null and void, and therefore unenforceable. Appellees’ motion was granted, rendering a full evidentiary hearing on the TRO and preliminary injunction moot. The evidentiary portion of the combined TRO or preliminary injunction proceedings was never reached, and the court was not required to make any rulings on Appellees’ bases for relief.
D. Directed Verdict
In contending that the court’s grant of a directed verdict whs reversible error, Appellants rely on Nav. R. Civ. P. Rule 47 which sets forth the circumstances *72 under which such a motion may be made and granted. Appellants further rely on Judy, supra, in which the Court discussed when a directed verdict is properly invoked, i.e. during a jury trial. Id. at 540, 5 Am. Tribal Law 418. A request and grant of a motion for “directed verdict” is evidently an error of law. However, to find for Appellants, we must be convinced not only that there was a misapplication of applicable law, but that such misapplication prejudiced Appellants. Absent a showing of prejudice emanating from an error of law, such error is harmless and will not be reversed. Biakeddy v. Biakeddy, 6 Nav. R. 391, 392 (Nav.Sup.Ct.1991).
It is clear from the record that Appellees did move the court for a directed verdict declaring that Resolution CO-41-09 is null and void as a matter of law due to lack of compliance with statutory enactment procedure, and the court granted this motion. Transcript of 12/H/09 Proceedings at 167-171. However, it appears that Appellees have simply mislabeled a motion for declaratory judgment as a motion for directed verdict. As it is within the court’s discretion in this action to grant a motion for declaratory judgment, the mislabeling of the motion is harmless error and the court’s judgment will not be reversed on this ground.
Appellants’ reliance on Judy v. White in their argument is misplaced. We clarify that the Court in Judy made no finding that mislabeling a motion as a motion for directed verdict is reversible error. The Court found only that White’s motion was actually a renewed motion for lack of subject matter jurisdiction or for failure to state a claim, both of which the Court had previously denied.
VIII
RESOLUTION CO-41-09
The district court applied the Chapo six-factor test and found that the enactment procedures at 2 N.N.C. § 164 were not followed by Appellants in enacting Resolution CO-41-09 placing the President on administrative leave, therefore Appellants were not entitled to the protection of the Sovereign Immunity Act and Resolution CO-41-09 is itself null, void and unenforceable.
This Court will review the findings of fact and conclusions of law contained in the final judgment to determine whether any legal errors were made and whether the decision should be upheld on the same, or different grounds. See Charley v. Benally, No. SC-CV-19-07, 7 Am. Tribal Law 647, 651 (Nav.Sup.Ct. December 10, 2008) citing Help v. Silvers, 4 Nav. R 46, 47 (Nav.Ct.App.1983). We review7 questions of law de novo, without deference to the district court’s decision. Judy, at 528, 5 Am. Tribal Law 418 citing Chapo at 456, 5 Am. Tribal Law 384.
A. The Chapo Test
The Chapo guidelines were applied by the court in order to determine whether Appellants acted beyond the scope of their authority and were, therefore, excepted from the Act.
Appellants have asserted that Chapo is not controlling in suits for governmental injunctive relief which do not involve claims in tort or breach of contract. The Chapo guidelines are intended to determine whether an official’s action was in their official or personal capacity for purposes of determining both individual liability and sovereign immunity. Chapo, supra at 458, 5 Am. Tribal Law 384. While it is true that governmental injunctive relief cannot be obtained from an official sued in his or her individual capacity, Appellees have sued the Council, and Speaker in *73 both his official and individual capacities.[13] In such cases, injunctive relief sought is normally in connection with procedural defects in which an official acted outside the scope of their authority when they negligently ignored procedure, or where steps were taken in good faith but which were ultimately not in compliance with law. The use of the Chapo test by the district court to resolve issues of sovereign immunity was not error.
We have previously found that the Act is not intended to apply in internal suits for injunctive or declaratory relief by and between the Navajo Nation. As a result of our holding, the issue of sovereign immunity is moot, and this Court will not further revisit the district court’s application of Chapo in our review.
B. “Matters Constituting an Emergency”
We have long required that our legislators strictly comply with Navajo Nation statutory enactment procedures. Procedural requirements for the enactment of Navajo Nation legislation must be strictly observed. Judy, at 538, 5 Am. Tribal Law 418, citing Peabody Western Coal Co. Inc. v. Nez, 8 Nav. R. 132, 138, 3 Am. Tribal Law 497 (Nav.Sup.Ct.2001). In addition, because of the fundamental principle of checks and balances, “[a]ll proposed resolutions of the Council or its committees ... must follow a process by which they are reviewed and signed by representatives of at least two of the branches.” Sloan, supra at 169.
Here, the proposed resolution placing the President on administrative leave was assigned number 0617-09, designated an emergency by the Speaker and placed by him on the agenda of a special session that he convened specifically to address the resolution. It bypassed all committees, and no copies were sent to the President, AG, or Controller. The resolution passed by a 40-22 majority vote, was certified by the Speaker, engrossed as Resolution CO-41-09, and the President was immediately placed on administrative leave.
The applicable procedures for the enactment of all resolutions are at 2 N.N.C. § 164. Proposed resolutions must be put through the following very stringent process of review. Proposed legislation intended to be voted on by the full Council must first be reviewed and approved both by the oversight committee(s) and Ethics and Rules Committee (Ethics and Rules) upon sponsorship by a delegate and drafting by the Office of Legislative Counsel. The proposed resolution is reviewed and drafted by the OLC and sponsored by a delegate or authorized Navajo Nation employee. Id., Section (A)(1). It is then presented to the Executive Director of the Office of Legislative Services (OLS) who assigns it a number. Id., Section (A)(3). The Speaker then assigns it to “respective oversight committee(s)” with copies to the President, AG, Controller, and affected division, department or program to be acted on at the committee’s next regular meeting. Id., Section (A)(k). These above steps must be completed before any proposed resolution requiring final action by the Council may be placed on the Council agenda. Id., Section (A)(7). Additionally, the proposed resolution “shall be assigned to at least two standing committees; the oversight committee(s) and the Ethics and Rules Committee” and the standing committees may amend and mark-up the proposed resolution, after which Ethics and rules may present the mark-up to the *74 Council. Id., Section (A)(5). Ethics and Rules develops the Council agenda at the Speaker’s recommendation 15 calendar days prior to the start of the Council’s regular session. Id., Section (A)(7).
The enactment procedures specifically exempt emergency legislation. The exempting provision states: “Resolutions which address matters which constitute an emergency shall not be subject to this provision.” Id., Section (A)(7)(a) (emphasis added). The district court found the provision ambiguous, then parsed the meaning of “this provision” and concluded that emergency resolutions are only exempt from the portion of Section (A)(7) that requires a proposed resolution to be placed on the Council agenda “15 days prior to the start of the regular sessions.”
We read (A)(7)(a) differently than did the trial court. It appears to us that “this provision” exempts emergency legislation from not just a portion of (A)(7), but all of it, including the requirement that proposed resolutions “shall have completed the procedures set forth in Subsections (1), (2), (3), and/or (4) of this section prior to placement on the agenda.” We read this exception to mean that an emergency legislation, due to the pressing public welfare need for such legislation, need not be drafted by the OLC; need not obtain a Council delegate as sponsor; need not be assigned a number; need not be approved by several committees; and need not be copied to the President, AG or Controller prior to placement on a Council agenda. Such legislation not only is exempt from these procedures, but may be rushed for Council vote in extremely expedited fashion by any member of the Navajo Nation public faced with a statutorily enumerated emergency situation requiring final action by the council. Of special note, the exception facilitates the Navajo public’s direct access to the Council when faced with a cessation of vital services or entitlements.
We disagree with the trial court and find that the procedural exception for emergency legislation is intentionally broad in service of the public welfare and provides the Navajo public with direct access to the Council floor in matters of pressing or dire public urgency as enumerated by statute. We take judicial notice that the Council has not adopted this interpretation in the past. It is our understanding that the Council requires emergency resolutions, without exception, to be sponsored by a delegate, drafted by the OLC, assigned a number by OLS, and placed on the agenda by the Speaker. This gives the Council greater procedural control over emergency legislation than a plain reading of the provision shows was intended. Apparently, the Council routinely uses the emergency legislation exception for all manner of legislation that ought not to qualify as emergency legislation, which enables a by passing of the statutory committee(s) review and approval process. We state uncategorically that such misuse of the emergency legislation procedural exception is impermissible.
“Matters constituting an emergency” are limited by 2 N.N.C. (A)(7)(a) to the following:
Cessation of law enforcement services, disaster relief services, fire protection services or other direct services required as an entitlement under Navajo Nation or Federal law, or which directly threaten the sovereignty of the Navajo Nation.

Id., Section (A)(7)(a).

The enactment of Resolution CO-41-09 had its beginnings on October 19, 2009, on the first day of the Council’s Fall Session, when the law firms’ investigative report was presented to the Navajo Nation Council. All verbal and written reports shall be *75 presented to the Council only on the first day of its regular sessions, 2 N.N.C. § 16i(A)(7). The report had been commissioned by the AG following the Auditor General’s concerns of overbilling by two businesses and possible circumvention of Navajo Nation procurement rules by members of the Executive Branch. The Council suspended the remainder of its agenda and reviewed the report in executive session. The President, on hand to deliver his State of the Nation Address, was ushered out of the Council Chambers. Within two days, a proposed emergency resolution was drafted by the OLC to place the President and his staff on administrative leave on the basis of the report. At the same time, a petition requesting a special session was circulated and signed by 80 delegates and submitted to the Speaker. OLS assigned a number to the proposed legislation and the Speaker scheduled a special session on October 26. The report was not shown to the President and never became public. Other than what the Speaker and Council delegates claim is contained in the report, the contents of the report, including the basis for any of its findings, remain unknown to the public to the present day.
In the intervening week, the AG issued a legal memorandum stating that his review of the law firms’ report found “scant evidence of any criminal conduct.” Appellants’ Brief-in-Chief p, 5. The AG cautioned the Council against passing the administrative leave resolution because 11 N.N.C. § 240(C), the statutory basis for putting the President on administrative leave, contains no due process procedures for defense or response, making such action likely to be challenged in the Navajo Nation courts.
On October 26, 2009, the legislation— brief and containing bare findings—passed by a 40-22 vote with 70 of 88 delegates present in special session. Certified by the Speaker and engrossed as Resolution CO-41-09, its operative effect was to place the President immediately on administrative leave with pay and refer the law firms’ report to the AG for appointment of a Special Prosecutor in the Window Rock District Court. The process of its enactment is notable for secrecy, haste, disregard for persuasive Navajo Nation legal authority, and the shabbiest of shabby treatments of the President, both individually and in his Office, in violation of the fundamental principle of fc’é.
We are troubled by the designation of Resolution CO-41-09 as emergency legislation. It is evident that it does not concern “cessation of law enforcement services, disaster relief services, fire protection services or (cessation of) other direct services required as an entitlement under Navajo Nation or Federal law.” 2 N.N.C. § m(A)(7)(a). Its only basis would be as a matter “which directly threaten(s) the sovereignty of the Navajo Nation.” Id. There is no indication that the Council made any effort to establish a public record showing the existence of a genuine emergency threat to our Navajo Nation sovereignty.
This Court is unable to find that a bona fide emergency existed for this administrative leave resolution that would justify by-passing committee review and approval. We are frankly puzzled by the absence of any hearing in this situation. We take judicial notice that a mechanism exists at 2 N.N.C. § 3772 providing for an administrative hearing by the Ethics and Rules Committee when there are allegations of misconduct by the President and other high-level Navajo Nation officials, after which the committee may make recommendations for sanction. Nothing on the record indicates an emergency need to circumvent this provision.
*76 We must find that CO-41-09 was not a matter constituting an emergency, and its designation as emergency legislation was in violation of 2 N.N.C. 164(A)(7)(a). As review and approval by at least two committees was by-passed and copies not distributed as required, the enactment of Resolution CO-41-69 was in further violation of 2 N.N.C. § 164(A)(4). Due to these abridgements of mandatory enactment procedure, we hold that Resolution CO-41-09 is invalid as a matter of law and affirm the trial court’s holding on these different grounds.
C. 11 N.N.C, § W(C)
The basis for the administrative leave resolution is 11 N.N.C. § 240(C) which provides:
The Navajo Nation Council may by majority vote of the Council, place the President, Vice-President or any of its members on administrative leave, with or without pay, where there are reasonable grounds to believe that such official has seriously breached his or her fiduciary trust to the Navajo People and such leave will serve the best interests of the Navajo People.
(Emphases added).
Appellees contend that the administrative leave provision at 11 N.N.C. § 240(C) has the improper connotation of an employer-employee relationship as a holdover from the pre-Title II era when the Chairman was also a Council delegate, and we agree. As we stated earlier, there already exists a sanctions mechanism with inbuilt safeguards at 11 N.N.C. § 3772 whereby allegations of misconduct concerning a sitting President are explored through public hearings convened by the Ethics and Rules Committee. In comparison, Section 240(C) lacks any due process safeguards and authorizes the Council to suspend a President by a simple majority vote based entirely on reasonable belief of wrongdoing and with no requirement for specific findings. We further note that temporary removal of the President or other high-level officials for reasons of possible or pending investigations is a drastic measure. Injunctions or restraining orders are readily available through the courts to protect documents or files needed for any investigation. For these reasons, 11 N.N.C. § 240(C) should no longer be used.
The Council, as a whole, is entrusted with government along with the other Navajo Nation leaders, and we affirm that all our leaders must be vigilant in performing our duties of checks and balances. If there is a serious concern about the conduct or inaction of the President or any high-level official, our government has an obligation to take action in the public interest, but the public also has a right to participate through public hearings.
We have already said, in this and other opinions, that it is the right of the People to choose their leaders. See In the Matter of the Appeal of Vern Lee, SC-CV-32-06, 6 Am. Tribal Law 788 (Nav.Sup.Ct. August 11, 2006) The office of an elected official belongs to the voting public. In re Removal of Katenay, 6 Nav. R. 81, 85 (Nav.Sup.Ct.1989). Once the official takes his or her oath and begins to serve, it is the liberty right of the People, under both the Navajo Nation Bill of Rights and Dine bi been a-haz’áanii, to have the continued service of the leader chosen by them, to remove the leaders via the polls, and to participate in any sanctions process.
The Office of the President, in particular, is an elected office serving unique public functions. In 1989, when the branches were created, we said there will now be a President separate from the Council in a separate branch, which will be the only office (with that of the Vice-President) that is elected by all the Navajo *77 People reservation-wide while all other offices are elected by communities in smaller areas. We normally call such a leader shi nat’ahi This individual out of all governmental offices has a direct relationship with all the People, his/her mandate comes from all the People, and he/she has the stature of representing the whole reservation. We emphasize the relationship between shi nat’ahi and the People, as shi nat’ahi are the ones that were voted in by the whole of the People in order to serve the People as a whole. That does not mean he/she is superior in the governmental scheme. It means that this is the individual who, when it is necessary to deal with other sovereigns, he or she is the one who is the face of the Nation, the embodiment of the Nation. The individual must always be mindful that he or she holds office solely for the public interest.
IX
ATTORNEYS’ FEES
The parties have not asked for attorney’s fees and costs. However, Amicus Mr. Arthur has asked for fees on the basis that he has expended his own resources as an individual to submit his amicus curiae brief in defending the interests of the People. He estimates his fees at less than ten percent of the $150,000 which the Council has spent on this appeal.
There is a long-standing rule under Navajo law that each party is responsible for their own attorney’s fees. Three exceptions to the rule have been recognized: 1) when a statute provides for attorney’s fees; 2) when the case presents a special set of circumstances; and 3) if a pleading or document is not submitted in good faith, or contains material misstatements of fact or law, or it is not made upon adequate investigation or research. Yazzie v. Herrick, 5 Nav. R. 129, 131 (Nav.Sup.Ct.1987). An award must fall within an existing special circumstance recognized by this Court, or the trial court must include supporting findings of fact and conclusions of law to justify a new exception. Brown v. Todacheeny, 7 Nav. R. 37, 43 (Nav.Sup.Ct.1992). Also, parties must receive notice and opportunity for a hearing before a court may award attorney’s fees. Begay v. Navajo Election Administration, 7 Nav. R. 139, 141 (Nav.Sup.Ct.1995).
Amicus Mr. Arthur’s contribution during the course of this appeal has been significant. While he is not a party, he has incurred costs in volunteering to appear as a friend of the court. We find that Mr. Arthur fulfilled the role of a party in this appeal through indispensable advocacy of the interests of the People, expressing the People’s fear that their government may be acting out of self-interest and proving unfaithful to its duties to the People and unfaithful to the teachings of Diñé bi been-ahaz’áanii.
As we have stated throughout this opinion, the People have a right to participate in their government processes, to challenge government action, to express then-views, and to have a meaningful voice in what form their government will take. If an award of fees will facilitate Mr. Arthur’s and others’ fundamental right to participate, then such a circumstance is a factor in finding special circumstances. In this case, the governmental actions challenged by Mr. Arthur have proved to be invalid and he has prevailed. Finally, Appellants’ have taken positions in this suit with regards to Navajo sovereignty and accountability to the People that are rightly of concern to the People. The totality of the circumstances lead us to find that a special circumstance exists. Therefore, we award fees and costs to Mr. Arthur.
Mr. Arthur shall prepare a detailed invoice of his fees and costs and present the invoice to the Navajo Nation Controller for payment. Mr. Arthur is to share copies of *78 the invoice with Appellants. If Appellants wish to contest the amount claimed, Appellants may petition this Court to convene an evidentiary hearing on the issue of the amount of fees and costs.
* * * *
We have heard that many of our non-Navajo practitioners rely solely on Navajo Nation Supreme Court opinions for an understanding of our Fundamental Laws and continue to be unfamiliar with our civilization in spite of sometimes decades of living in border towns near us and practicing in our courts. There is a saying that we have, that it is up to you to learn, T’ááhó Ájít’éigo. Our culture is best known through interactions and experience, not through interpretations and secondary sources. We exhort those advising our government and those practicing in our courts to seek out knowledge by going among our Diñé People and experiencing the Diñé way of life first-hand.

. "Navajo Nation” means the President, Council delegates, Council and the Executive, Legislative, and Judicial branches as well as Council committees, governmental commissions, chapters, Kayenta Township, Navajo enterprises, community colleges, housing authority, and gaming enterprises. 1 N.N.C. § 552.

. The U.S. Court of Appeals, District of Columbia Circuit in Barnes v. Kline, 759 F.2d 21 (1985) stated:
When a proper dispute arises concerning respective constitutional functions of the various branches of the government, “[i]t is emphatically the province and duty of the judicial department to say what the law is." Courts may not avoid resolving genuine cases or controversies ... simply because one or both parties are coordinate branches.
Id. at 27, citing Marbury, 1 Cranch 137, 5 U.S. 137, 177, 2 L.Ed. 60 (1803).

. This Court has held that Sections 1964(F) and (H) "cannot interfere with the Court’s power to regulate attorney practice before the Supreme Court.” Eriacho, supra at 603, 5 Am. Tribal Law 469.

. Since the abolishment of the Supreme Judicial Council in 1983, Halona has been cited twelve times as precedent by the Court of Appeals and then the Navajo Nation Supreme Court.

. See, e.g., Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 267-68, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

. In the Matter of Two Initiative Petitions Filed By Navajo Nation President Dr. Joe Shirley, Jr., No. SC-CV-41-08, answer to certified question (Council may reasonably regulate the People’s authority to make laws through setting qualifications for voters in referenda and initiatives, but the ultimate power to govern the Tribe always remains with the People) (Nav.Sup.Ct. July 22, 2008); In the Matter of the Navajo Nation Election Administration's Determination of Insufficiency Regarding Two Initiative Petitions Filed By Navajo Nation President Dr. Joe Shirley, Jr., No. SC-CV-24-09, 8 Am. Tribal Law 240 (Nav. Sup.Ct. June 22, 2009) (Issuance of Writ of Superintending Control so that validity of NEA's finding of insufficiency of thousands of signatures on Initiative petitions may be speedily contested); In the Matter of Two Initiative Petitions Filed By Navajo Nation President Dr. Joe Shirley, Jr., No. OHA-EC-050-08 (OHA June 24, 2009) (Final Judgment finding that that initiative petitions for reduction of Council and giving President line-item veto were sufficient, and the initiative may proceed to vote); In the Matter of the Navajo Nation Election Administration's Determination of Insufficiency Regarding Two Initiative Petitions Filed By Navajo Nation President Dr. Joe Shirley, Jr., No. SC-CV-28-09, 8 Am. Tribal Law 261 (Nav. Sup.Ct. July 31, 2009) (affirming OHA decision); motion for reconsideration denied, (Nav. Sup.Ct. Sept. 2, 2009) (denying NEA motion to reconsider as the assertion that ‘‘stipulations were admitted to by mistake” did “not warrant reconsideration”).

. There is no express “separation of powers” doctrine in the U.S. Constitution, no "doctrine of discovery” under which the United States claimed title to tribal lands and which has been used to invalidate and ignore tribal possession of land, and no power of judicial review, which is one of the most fundamental concepts in United States government today, serving as a check and balance on the laws passed by Congress and the actions and treaties of the U.S. President. These doctrines appear to be on the basis of fundamental fairness in the Anglo context, applied to prevailing Anglo notions of citizenship (e.g. in cases of conquest, race relations, and immigration). The U.S. Supreme Court continued *62 to look to natural justice as well as to written constitutions. Supreme Court Justices wrote opinions that contained at least some references to extra-textual principles, not merely as a method of interpreting the written constitution itself but in order to judge the legality of the challenged statute or other governmental action. State courts also continued to rely on unwritten (Anglo) fundamental law. See Susanne Shelby, The Founders' Unwritten Constitution, 54 U. Chi. L.Rev. 1127, 1176 (1987).

. The judiciary in the federal courts has not shirked from its duty to serve as the people’s watchdog over the exercise of power by and between the branches. The U.S. Constitution contains both specific rights and implied principles, much like our Fundamental Laws. The implied "separation of powers” principle— vesting in each branch sole functions—is qualified by the implied doctrine of "checks and balances” in which the judiciary has played a major role restraining abuses by the branches since Marbury v. Madison, 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 (1803)

. There are other versions of this episode. In one version there was a leader who needed to be replaced, and the owl provided guidance on the search and methods for selection of new leaders.

. There are detailed narratives relating to nayee that will not be repeated here.

. Navajo Nation Council Work Session, Navajo Nation Statutory Reform Convention Proposed Amendments to Title 2 and 11 (October, 2002).

. We recognize that the federal courts, not *68 withstanding the “cases and controversies” clause of the U.S. Constitution, have issued such clarifying opinions to address future injury when “there is a substantial controversy, between parties having adverse legal interest, of sufficient immediacy and reality to warrant” relief. See MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 S.Ct. 764, 771, 166 L.Ed.2d 604 (2007).

. Appellants did not ask the district court to dismiss the suit against the Speaker in his individual capacity and have not raised the issue before this Court.