*John GOLDTOOTH*
Petitioner-Appellant
*vs.*
*NAA TSIS' COMMUNITY SCHOOL, Inc.*
Respondent-Appellee
In the Supreme Court of the Navajo Nation

No. SC-CV-14-04

July 18, 2005

---

Dennis Glanzer, Esq., Flagstaff, Arizona, for Appellant.

Lawrence Ruzow, Esq., Window Rock, Navajo Nation, for Appellee.

Before FERGUSON, Acting Chief Justice, and G. BENALLY and HOLGATE, Associate Justices.

This case arises out of an employment contract allegedly created when an employee of the Naa Tsis' Áán Community School accepted an offer made by the school's executive director. Based on our review, we reverse the Navajo Nation Labor Commission.

## I

The relevant facts are as follows. Mr. John Goldtooth (Goldtooth) was employed as a computer technician by the Naa Tsis' Áán Community School (School) under a "classified contract" for the 2000-2001 school year. The School uses

"classified contracts" for positions that do not require a teacher certification. Goldtooth agreed under the contract "to comply with all School-related and Board policies." Contract, ¶ I(E), Petitioner's Exhibit 15. Goldtooth also signed an "Employee Acknowledgment Form" stating that he received, reviewed, and understood that he was to familiarize himself with the School's Personnel Policy Manual (Manual). By his signature on the form he also acknowledged that the Manual and any revisions were part of the contract.

The Manual contains specific provisions concerning the renewal of employee contracts. It provides that the School Board (Board) renews or does not renew contracts. According to the Manual, if the Board decides not to offer a new contract, the Board "shall direct the Executive Director or his/her designee to send a letter informing the employee of a non-renewal." Personnel Manual, § 300.11, Respondent's Exhibit F. If the Board decides to offer a contract, "the written contract shall be offered as soon after the Board meeting as is practical." *Id.* If the Board does not offer a new contract, formally delay action, or notify a non-certified employee of its decision not to renew a contract before April 30, "such employee shall be deemed not to have been offered a new contract." *Id.*

The dispute arises out of a contract offer for the 2001-2002 school year made by Executive Director Calvin McKerry (Executive Director). On April 3, 2001, the School Board held a meeting in which it considered contract renewals for the upcoming year. Goldtooth's name was not included on a list submitted to the Board for consideration, and consequently the Board took no action on Goldtooth's contract. There is no evidence that Goldtooth had actual knowledge that the Board did not act on his contract. Despite the Board's lack of approval, the Executive Director sent Goldtooth a letter dated April 5, 2001 offering a contract. The Executive Director also sent out similar letters to offer contracts to employees who were approved by the Board. In the letter the Executive Director stated that "the Governing Board decided to offer to renew your contract for the school year 2001-2002." Respondent's Exhibit A. The letter requested that Goldtooth sign at the bottom to accept the contract offer. On or about April 19, 2001, Goldtooth signed the letter and returned it to the Executive Director.

School officials eventually informed Goldtooth that the Board had not approved his renewal, but not before Goldtooth received and signed a new contract. In May 2001, Goldtooth received a "Certified Employee Contract" for school year 2001-2002. Goldtooth signed the contract on May 23, 2001. The contract required that the employee have a teacher certification for the position. Goldtooth was not certified. No representative of the Board signed the new contract. The following day, May 24, 2001, the Executive Director sent a letter informing Goldtooth the Board had not authorized the contract renewal. On May 25, 2001, Goldtooth's contract for the previous year expired on its own terms. On July 20, 2001, the School Board formally voted to rescind Goldtooth's contract. Subsequently, the School's Business Manager, Linda Smallcanyon, sent a letter to

Goldtooth stating that his contract would be declared void and rescinded because "the school never included [his] name in the original hiring roster" and "[he did not] have an officially signed or approved contract." Respondent's Exhibit c.[1]

Goldtooth filed a claim under the Navajo Preference in Employment Act (NPEA), 15 N.N.C. §§ 601 *et seq.* (1995), before the Navajo Nation Labor Commission (Commission). The Commission ruled that the Board never authorized the Executive Director's contract offer, and therefore any contract was null and void. Specifically, the Commission ruled the notice to Goldtooth stating his contract was null and void was not "adverse action" under 15 N.N.C. § 604(B)(8) (1995), and that he therefore had no claim under the NPEA. This appeal followed.

## II

The issue in this case is whether a binding employment contract is created when an executive director of a school, who had the authority to send out contract offers on behalf of the school board, sent a letter offering an employment contract allegedly on behalf of the board, though the contract was never approved by the board, and the employee accepted the offer unaware of the lack of board approval.

## III

We review decisions of administrative tribunals like the Commission under an "abuse of discretion" standard of review. *Sells v. Rough Rock Community School*, 8 Nav. R. 645, 648 (Nav. Sup. Ct. 2005). The Commission abuses its discretion, among other ways, when it makes an erroneous legal conclusion. *Id.* Whether there is a binding contract in this case is a legal question. We give no deference to the Labor Commission's conclusions on this issue, reviewing the question *de novo.*

## IV

### A

The only issue in this case is whether a valid contract exists between Goldtooth and the School. Whether a contract exists determines whether there was "adverse action" under the NPEA. This Court recently defined "adverse action" in the employment contract context. In *Sells* we defined "adverse" as "result[ing] in some tangible, negative effect on the Plaintiff's employment." 8 Nav. R. at 648. The School's refusal to employ Goldtooth clearly is "adverse." "Action" in this context does not include all types of acts by the employer, however, but only those acts affecting "ongoing employment." *Id.* In this case, if there is no contract, there was no "ongoing employment," and the School's refusal to employ Goldtooth after the previous school year's contract ran out is not a violation of the NPEA. *See Id.* at 650 (holding notice that contract terms were fulfilled

1 It is unclear from Smallcanyon's letter whether the Board believed that no contract was ever formed, or, if there was a contract, the Board's unilateral "rescinding" of the contract meant it became unenforceable.

and that employment would not continue not "adverse action"). If there was a contract, then there was "adverse action," as the School refused to continue his employment when he had a right to ongoing employment.

Assuming there was "adverse action," the validity of the contract also determines whether there was "just cause" under the NPEA, and therefore whether the School is liable to Goldtooth for damages. If there was "adverse action" the School must have provided written notification of "just cause" for the action. *See* 15 N.N.C. § 604(B)(8) (1995). At oral argument the School conceded that if the contract is valid, it did not provide written notification of any "just cause" and would be liable under the NPEA. This is because the only written reason given for the School's refusal to employ Goldtooth in both the letters sent by the Executive Director and the Business Manager was that the contract was not binding because the Board did not authorize it.[2]

### B

Whether there is a contract or not depends on whether the Executive Director's offer letter and Goldtooth's subsequent acceptance is enough to form a binding agreement. Goldtooth argues the Executive Director had at least "apparent authority," even if he had no actual authority to offer the contract without the Board's approval. Goldtooth urges this Court to adopt a rule from the Restatement of Agency which recognizes the formation of a binding contract when an "agent" (here the Executive Director) has apparent authority from the "principal" (the Board) to enter into binding agreements on behalf of the principal. An "apparent agent" is a person who, whether authorized or not, reasonably appears to a third person, because of manifestations of another, to be authorized to act as agent for the other. *See* Restatement (Second) of Agency, § 8; *see also* §§ 124A, 125 (1958). Black's Law Dictionary has defined "apparent authority" as "such authority as a reasonably prudent [person], using diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess." Black's Law Dictionary 88 (5th Ed., 1979) (citations omitted). Under these rules, a contract is formed if Goldtooth's belief that the Executive Director had the authority to offer the contract is reasonable under the circumstances, based on the conduct of the Board. The School argues that Goldtooth's reliance on the Executive Director's offer was not reasonable, as only the Board may authorize contracts under the Manual, making the contract simply null and void.

2 The School argues alternatively that the contract received by Goldtooth after he accepted the Executive Director's offer required him to be a certified instructor, which he was not. As he was not certified, the School argues that the Board owed him nothing, as he himself did not fulfill a requirement under the contract. Regardless of whether the certification provision in the contract applies to his position, the Board did not give that reason for refusing to employ Goldtooth. Therefore, whether or not he was required to be certified, the lack of certification was never communicated in writing to Goldtooth as justification for ending his employment and cannot be "just cause" under the NPEA.

As the NPEA does not discuss when employment contracts are validly made, we look to other non-statutory law to decide this case. In the absence of statutory law, we first and foremost consider *Diné Bi Beenahaz'áanii* (Navajo Fundamental Law). *See* 7 N.N.C. § 204(A) (as amended by Navajo Nation Council Resolution No. CO-72-03 (October 24, 2003) (mandating use "whenever Navajo Nation statutes or regulations are silent on matters in dispute before the courts.")); *Tso v. Navajo Housing Authority*, 8 Nav. R. 548, 557 n. 1 (Nav. Sup. Ct. 2004). We also consider other ways of dealing with a problem, including approaches in *bilagáana* legal thought such as the Restatements when consistent with fundamental Navajo legal principles, particularly in situations involving adopted concepts like the employment contract issues presented in this case. *See Eriacho v. Ramah District Ct.*, 8 Nav. R. 617, 625 n. 1 (Nav. Sup. Ct. 2005) (looking to Navajo Common Law and federal approaches to court procedures); *Navajo Nation v. Rodriguez*, 8 Nav. R. 604–614 (Nav. Sup. Ct. 2004) (same for relationship between persons accused of a crime and Navajo police); *Jensen v. Giant Industries Arizona, Inc.*, 8 Nav. R.203, 211 (Nav. Sup. Ct. 2002) (adopting section of Restatement (Second) of Torts); *Brown v. Todacheeney*, 7 Nav. R. 37, 39 (1992) (warranty of habitability). Through the consideration of various approaches, we come to a solution that brings the parties before us back into harmony and that provides guidance to others within the Navajo Nation consistent with our beliefs and principles.

Under the circumstances of this case, we hold that a binding contract exists between the parties. Under the rule suggested by Goldtooth, the Executive Director had the apparent authority to offer the contract, as Goldtooth's belief that such authority existed was reasonable based on the conduct of the Board. Goldtooth's acceptance therefore was enough to create a contract.

This conclusion is based on several facts. Goldtooth did not know the Executive Director's representation that the Board had approved his contract was untrue. From Goldtooth's perspective, he simply received a contract offer from the Executive Director on the behalf of the Board. That an official with the title "Executive Director" sends an offer letter on the behalf of the Board, in the absence of evidence that Goldtooth had knowledge that such letter was unauthorized, makes his understanding of the Executive Director's authority reasonable. The mere setting out of the procedure for approval in the Manual is not enough to make Goldtooth's belief unreasonable. The Manual only indicates that the Board makes a contract offer, but it does not indicate how that offer is

communicated to the employee.[3] In practice, the Executive Director had actual authority from the Board to send out offer letters, as he issued similar letters to other employees on behalf of the Board. *See* Brief of the Appellee, at 15 (indicating Executive Director sent letters to other employees at the same time he sent letter to Goldtooth). The School does not argue that the Executive Director lacked the authority to issue any offer letters, but argues that he did not have authority to issue the specific letter to Goldtooth in the absence of a vote to approve the contract. Under these circumstances, to require each employee to check with the Board when a letter from the Executive Director claims authority from the Board to offer a position places an unrealistic burden on the employee. Employees should not be required to second guess an executive director's contract offer. We will not impose that burden here.

Further, this rule is consistent with the Navajo concept of *naat'áanii*.[4] A *naat'áanii* is an individual with a persuasive role within a community. In this context, a community may be any identifiable group: a clan, town, chapter, institution or other group. Within this definition, the Executive Director fulfilled the role of *naat'áanii* within the School and the community the school serves. Goldtooth was employed with the school and a member of the community, and as a *naat'áanii* the Executive Director's words carry great weight for him. Under this principle, his representations to Goldtooth that his contract was approved for renewal were to be accepted and followed by Goldtooth absent clear guidance from the Board that the Executive Director's authority was limited. Therefore, pursuant to principles of apparent authority and the concept of *naat'áanii*, we will require the School to accept responsibility for the Executive Director's words and conclude there is a binding contract.

As there is a binding contract, the later refusal to honor it by the Board was "adverse action" under the NPEA without "just cause." The Labor Commission erred, and we must vacate its decision.

## IV

Based on the above, we REVERSE the Labor Commission's decision in this case. We REMAND the case to the Commission for consideration of damages for Mr. Goldtooth.

3  Had the Manual clearly set out how offers were to be communicated to employees from the Board, such as a clear requirement that offer letters be signed or co-signed by the Board Chairperson or President, Goldtooth's belief that a valid contract was formed would not have been reasonable. The Manual mentions explicitly the role of the Executive Director when the Board decides not to renew a contract, as it requires the Executive Director to send a letter to the employee stating the Board's decision. Manual, § 300.10. The next paragraph of the Manual deals with the Board's decision to offer a contract, and mentions that a "written contract shall be offered." *Id*. That paragraph does not state, however, who delivers the offer. *Id*.

4  This Court questioned both sides at oral argument as to the effect, if any, on the case if the Executive Director were considered a *naat'áanii*.