OPINION AND ORDER DENYING RECONSIDERATION

This matter comes before the Court following the timely filing of a Petition for Reconsideration on November 16, 2010 by Appellee, Mr. Ferlin Clark. For reasons set forth below, Mr. Clark’s petition is denied.
We issue this decision as an opinion because of issues of law raised by Appellee regarding the significance of the holding of sacred items[2] on an employment contract, *361 and regarding what authority a probationary justice retains pending presidential action when the Judiciary Committee has recommended against permanent appointment.
I
Jurisdictional bases, previously set forth in our October 27, 2010 opinion in this matter, are incorporated herein by reference.
II
SACRED ITEMS OF THE COLLEGE
Appellee states that he was formally entrusted with sacred items as President of Diñé College. Therefore, as a matter of Navajo fundamental law, his employment as President may not be terminated unless a formal ceremony is conducted passing the ceremonial items to a successor. Ap-pellee asserts that this Court erred in stating that the sacred items belong to the College as if they were items of property, and further erred in finding that a ceremony passing the sacred items is not necessary for his employment to be terminated.
We clarify that this Court’s sense of “belong” or own is in the sense of being rightly placed in a specific position, not in relation to property. In finding that the right place for the sacred items is the College, we relied on the Navajo Nation Labor Commission (NNLC)’s undisputed findings that the items were bestowed on the College by the College founders.[3]
We note that the NNLC made no comment after Appellee had testified at length to the NNLC on the psychological effects on him as the holder of the College’s sacred items when the College had placed him on administrative leave. When in this appeal, Appellee asserted to this Court that a ceremony to surrender the sacred items is required before the College may terminate him, we were frankly uneasy. This matter has been raised in the atmosphere of chaos which has engulfed both parties, who cannot speak directly to each other and who even mutually deny events which occurred in their presence. Matters of sacred ceremonies ought to be discussed with a heightened measure of k’é—a sense of balance, restoration among the parties, and coming from the heart. K’é is naturally diminished in an adversarial forum where one party is accusing the other and there is no consensus that an ongoing relationship is even desired. Therefore we have refrained from giving any but the broadest comments on this issue. However, Appellee has now pressed us to say more and we will do so.
There are two processes here which Ap-pellee would have us conflate into one— terms of employment pursuant to an employment contract, normally addressed as legal issues, and the ceremonial passage of sacred items by an outgoing President of the College to the College’s incoming Pres *362 ident. There are distinct duties and responsibilities in both for the benefit of the College and its students, and the Navajo People.
Unlike mere job duties, sacred items confer duties of the heart and spirit. We note that traditionally, a jish is entrusted to a medicine man who may then perform ceremonies, songs and prayers. The association of other sacred ceremonial items (which also may constitute part of a jish) with an institution such as Diñé College is a modern-day development where the holder, here the President of the College, appears to be relieved of the actual ceremonial duties and instead, is given intangible duties of heart and spirit to uphold Diñé philosophy in the education of our children. The establishment of hierarchical institutions is also a modern-day development, and perhaps it is inevitable that there will be confusion regarding the symbolism of sacred objects when associated with such institutions. We note that such sacred items are not mere symbols, but are medicine as traditionally used by the Diñé. This is another reason why this Court would prefer making no further comment.
We take judicial notice that sacred items have never been taken as conferring hierarchical authority and power over institutions or people, only duties and responsibilities of the heart and spirit to protect and heal. The Diñé, being an egalitarian people, have traditionally not conferred authority on those not deserving, and in no event on the basis of heredity or the holding of sacred or other objects. The sacred items are not like a bilagaana scepter or crown or a great seal of office.
If such sacred items are to be viewed as symbolizing an authority of office, this would be the first time such items are used in such a manner. Therefore, it must be clearly stated by the government or program in which such items are intended to be used as conferring power and authority. No presentation has been made that the Board’s Bylaws and Manual dictate ceremonial passage of the sacred items before its holder may begin performing job functions and draw a salary, or be terminated and the salary ended. Therefore, we affirm our holding.
We note in closing that it is beyond the jurisdiction of any adversarial proceeding to dictate the proper handling of sacred ceremonial items, to make findings on the story of their creation, or to settle the guidelines for their use. This Court will not engage in adversarial sparring concerning these matters, and such matters are not to be discussed in the environment of gamesmanship and obfuscation that often takes place in adversarial forums.
Appellee was entrusted with sacred items for which he and the College know the purpose and instructions by which they were bestowed upon him. He is to approach this entrustment honorably in the proper passage of the College’s sacred items for the sake of the mental, psychological and emotional well-being of the students of Diñé College. We cannot otherwise mandate the disposition of such sacred items.
Ill
TWO-JUDGE DECISION
Appellee argues that this Court should have rescheduled and reconvened oral argument with a third judge after the retirement of Associate Justice Louise Grant rather than issue a two-judge decision. We disagree.
Firstly, notice of a two-justice panel decision was issued to the parties on October 13, 2010 and no objections were received. Secondly, in Benally v. Mobil Oil Corp., 8 *363 Nav. R. 365, 368, — Am. Tribal Law-(Nav.Sup.Ct.2003), we held that two-justice panel decisions are proper when the composition of the Court changes following oral argument for reasons beyond the Court’s control.
In Benally, supra, we stated that when the Council enacted the Judicial Reform Act of 1985, it removed the three-judge panel requirement and included a new “necessary and proper” section. We found that by these amendments, the Council intended to facilitate appeals by permitting two justice decisions where “necessary and proper” as long as the Chief Justice or his/her designate presides. Id. Such circumstances include where parties have already submitted their briefs and three justices have heard oral argument before one of the justices is no longer available to make a decision. Id. This is the case here, where Justice Louise Grant retired prior to decision.
Appellee also argues that the two justice opinion in this case is improper because Justice Eleanor Shirley, the remaining Associate Justice in this case, had not been recommended for permanent appointment by the Judiciary Committee following expiration of her probationary period. Appellee argues that 7 N.N.C. § 355(A) prohibits a justice from continued service in the capacity of justice after expiration of his or her probationary period if the Judiciary Committee has recommended against permanent appointment and the President has not yet acted on the Committee’s recommendation. Noting that a recommendation from the Judiciary Committee results in no change in status of a justice pending presidential action on that recommendation, we find no such limitation in Section § 355(A), nor in Sections (B)-(E) of this provision.
Appellee next cites 7 N.N.C. § 355(E), which provides that “The President shall not appoint to a permanent position any probationary Justice or Judge not recommended by the Judiciary Committee.” Appellee argues that because this provision prohibits the President from permanently appointing a justice whom the Judiciary Committee has not recommended permanent appointment, Justice Shirley therefore lacked authority under Section § 355(A) to sign opinions. We note that the service status of the justice remains unchanged until the President acts, and there is no timeframe in which the President is required to act. Secondly, Section 355(E) presumes the propriety and legality of the Judiciary Committee’s recommendation. Such a presumption may be overcome if the Committee was not in compliance with Navajo law and its own rules in reaching that recommendation. Section 355(E) constrains only the President’s power of appointment, not his ability to question the legality or propriety of the Judiciary Committee’s recommendations in order to ensure compliance with Navajo law.
According to its hearing rules, the Judiciary Committee must reach its recommendation “in accordance with 7 NNC 355(C)-(E), 2 NNC 574(D)-(G), In the Matter of Certified Questions II, 6 Nav. R. 105 (Nav.Sup.Ct.1989) and other applicable laws of the Navajo Nation.” Id. Hearing Rules of the Judiciary Committee of the Navajo Nation Council to Evaluate the Performance of Probationary judges, JCMY-02-09, Exhibit A, Rule 1(C) (May 21, 2009). This means that the Committee’s recommendation must be in compliance with doctrines of separation of powers, checks and balances, and the emphasis on a strong and independent judiciary as set forth in Title 2 and 7, and several of odr decisions including In re Certified Questions II, supra.
*364 While In re Certified Questions II, supra, is frequently taken for the proposition that once the Judiciary Committee issues a recommendation regarding a probationary justice’s permanent appointment, the President has no choice but to follow that recommendation; however, the opinion has a more profound meaning. Reading Part One comprehensively, In re Certified Questions II stands for the overriding need to maintain a “strong and independent” court system in order to protect the public, id. at 109, and ensure that “the checks and balances implicit in [Title 7] will work,” id. at 109-110. The public has “an overwhelming and compelling interest in ensuring that only qualified and ethics-conscious individuals become judges. The Navajo public has an interest in a strong and independent judiciary. Navajo sovereignty is strengthened by a strong and independent judiciary.” Id. at 106-110. This proposition is further supported by 2 N.N.C. § 572(A) which provides that among the purposes of the Judiciary Committee is “To improve the administration of justice on the Navajo Nation by ensuring an independent judiciary free from political influence in its deliberative process that remains accountable and responsible to the Navajo Nation for its administration and operational activity.” (Emphasis added).
The Court in In re Certified Question II sought to prevent encroachment on the powers of the judiciary by the then-Chairman of the Navajo Nation Council. Seeking to protect judges from removal on the Chairman’s say so alone, the Court required the Chairman to follow the recommendation of the Judiciary Committee as agreed to by the Chief Justice, who “have seen the performance” of the judge and were in “prime positions” to evaluate such judges.” Additionally, the Court emphasized that the “Chief Justice has first-hand knowledge of the work of the probationary judge.” In re Certified Question II, at 108. While addressing a specific encroachment by the then-Chairman of the Council, In re Certified Question II stands generally for the protection of the public and prevention of any encroachment on the powers of the judiciary in contravention of the doctrines set forth in that decision. We note that the safeguards set forth in In re Certified Question II have great bearing on the appropriateness and legality of the Judiciary Committee’s recommendation and the President’s responsibilities regarding that recommendation. Doctrines of sound government as set forth above are to be followed. As we previously stated, the President is not constrained from questioning the legality or propriety of the Judiciary Committee’s recommendations in order to ensure compliance with Navajo law. The Navajo People, who are the source of our governmental authority, rightly expect its government to be true to itself and its fundamental foundations and to be accountable for its actions. See, e.g., Shirley v. Morgan, No. SC-CV-02-10, 9 Am. Tribal Law 46, 66-67 (Nav.Sup.Ct. May 28, 2010).
On the above bases, we find that the provisions cited by Appellee do not prohibit the continued service of a probationary justice or judge where the President has not yet acted on the recommendation of the Judiciary Committee against permanent appointment.
IV
OTHER ISSUES
Appellee asks this Court to remand the issue of Appellee’s employment contract. However, illustrating the uncommon route taken by this case in reaching this Court, a remand forum does not exist as neither a NNLC charge nor dis *365 trict court complaint has been filed. We note that neither party has previously objected to this Court’s jurisdiction over the matter. Furthermore, sending this matter down to a tribunal entirely unfamiliar with the issue would unduly prolong litigation, time and expense when the College and its students greatly need finality. Therefore, we deny Appellee’s request.
Appellee next asserts that this case is nearly identical to Goldtooth v. Naa Tsis' Community School, Nav. R. 682, 6 Am. Tribal Law 667 (Nav.Sup.Ct.2005) in which we held that an employee may rely on the apparent authority of the Executive Director of a school board when offered renewal of an employment contract by mistake, when the Executive Director had done so believing that the board had voted to renew Goldtooth’s contract when it did not. Appellee argues that we must follow our own precedent. However, this case is critically different from Goldtooth.
In Goldtooth, the employee was a school staff member who did not attend board meetings. The Goldtooth Court had stated that the employee must be able to rely on the Executive Director’s apparent authority to make the job offer to him because to require “each employee to check with the Board when a letter from the Executive Director claims authority from the Board to offer a position places an unrealistic burden on the employee.” Id. at 692, 6 Am. Tribal Law 667. Unlike Goldtooth, in this case Appellee is, himself, the highest-ranking officer of the Board and was present when the re-vote on the Board’s intent to renew Appellee’s contract was placed on the agenda. He was also present later on in that meeting after the Board cast their vote, following which Board members informed him directly that they had voted on the agenda item, had ratified their action from their November meeting, and Appellee “would be given an opportunity to respond to the issue and propose what recommendations the Board of Regents will consider at the January (2010) meeting” including his response to a proposal for a two-year contract. Appellant’s Supplemental Filing, Ex. L, Transcript prepared from audio tape recording, Diñé College Board of Regents Meeting, December 18, 2009, pages 1 and 6-7. The proposed and unexecuted contract that was provided to this Court sets forth not a two-year, but a four-year term of employment, which Appellee crossed out in his own handwriting and wrote in “3 year.” While Appellee has represented that he understood the meeting to have concluded with a firm employment offer rather than a resolution to begin contract negotiations, the minutes and the changes in the contract show otherwise and clearly indicate that at least one vital contract provision was not yet settled.
In this case, we have a board resolution purporting to ratify a completed contract at the above board meeting. However, the minutes, affidavit of the board president, and apparent uncertainty as to whether the employment term would be two, three or four years show that the contract had yet to be fully resolved. The resolution itself contains discrepancies even as to the proposed employment term. Having been present at the December 18, 2009 meeting and thereafter having made substantial changes to the proposed contract in his own handwriting, Appellee can neither reasonably rely on the above resolution as a firm offer in the mold of Gold-tooth, nor claim that his actions signified acceptance. See Gene v. Hallifax, 8 Nav. R. 20, — Am. Tribal Law-(Nav.Sup. Ct.2000) (contracts require a “meeting of the minds”); see also Hood v. Bordy, 6 Nav. R. 349 (Nav.Sup.Ct.1991); Amigo Chevrolet v. Lee, 6 Nav. R. 31 (Nav.Sup.Ct. 1988).
*366 Due to the above significant differences from Goldtooth, we find no merit in Appel-lee’s position.
Appellee next argues that this Court erred in ruling on the limitations of 10 N.N.C. § 2003(A) (prohibiting government officials from interrupting or interfering with day-to-day board activities) because it should have been remanded to a fact-finding court. We disagree. This Court was obliged to address challenges regarding the board’s standing to pursue this appeal, and properly did so by examining the legal effect of all relevant Title 10 provisions.
Finally, Appellee argues that when the Government Services Committee (GSC) disabled the Board of Regents by reducing its membership to below quorum without explanation, the GSC did not violate Section 2003(A) because the Council has reserved or “big picture” oversight powers over the Board, whose authority is derived from the Council. Appellee is apparently claiming that the Council and its Committees are exempt from the category of “government officials” set forth in Section 2003(A) because of the Board’s delegated authority. We cannot agree with this assertion. Section 2003(A) ensures the autonomous governance of Diñé College without interruption and with minimal government interference, which is, additionally, an accreditation requirement in the United States to ensure institutional and programmatic independence and quality. Neither Section 2003(A) nor any other provision in Title 10 or elsewhere in the Navajo Nation Code exempts the GSC. Title 10 expressly sets forth all powers and limitations of the Council and the Board in the governance of Diñé College. Therefore, we find Appellee’s position astonishing, unsupported, and meritless.
V
CONCLUSION
Appellee has not established that our prior decision was in error. Accordingly, our October 27, 2010 opinion is AFFIRMED.
Additionally, we HOLD that it is beyond the jurisdiction of any adversarial proceeding to dictate the proper handling of sacred ceremonial items, to make findings on the story of their creation, or to settle the guidelines for their use.
Finally, we NOTE that the President is not constrained from questioning the legality or propriety of the Judiciary Committee’s recommendations regarding permanent appointment of probationary justices or judges, in order to ensure compliance with Navajo law.

. While Appellee uses the words "sacred medicine bundle” in his reconsideration petition, *361 we termed them "sacred items” in our Opinion of October 27, 2010 and continue to use this term herein, because the nature of the items has not been clearly established, and the phrase "medicine bundle” should not be carelessly used. "Sacred items” is a general term to refer to items that were placed in trust with Mr. Clark through ceremonial processes. No clear explanation was provided by the Appellee as to what specific items he received. The testimony at the Commission refers to a sacred basket, staff, bow and arrows, and the Commission decision says "medicine bundle.” The Appellee also uses the terms jish and sacred bundle interchangeably. For the reasons stated, the Court will use the general term.

. Findings of the Navajo Nation Labor Commission, Clark v. Diné College, No. NNLC 2010-016 at 4 (April 6, 2010), Exhibit A, Appeal Brief of Respondent-Appellant.