OPINION

In this original proceeding filed on January 24, 2012, Petitioner Maurice James seeks a writ of mandamus or superintending control against the Window Rock Family Court due to the family court’s eight month inaction on James’ Petition for Termination of Parental Rights and Adaption of a Minor Child that was filed on May 3, 2011. Petitioner asks the Court to *44 take whatever action this Court thinks appropriate, including compelling the family court to schedule a hearing or direct the matter to be heard by a different judge. We issue a writ of mandamus for the reasons set forth below.
I
Petitioner James filed his petition on May 3, 2011 seeking to adopt the recently born infant daughter of his aunt, who had been in James’ care since her birth. Both the infant’s natural parents consented in writing to the adoption. James also filed a Motion to Waive Investigation of Natural Parents Prior to Termination of Parental Rights and Order Investigation of Adoptive Parents Prior to Adoption and Motion for Immediate Temporary Guardianship Pending Outcome of Petition for Termination of Parental Rights and Adoption,. The family court was unresponsive to this filing. Between May 3, 2011 and July 19, 2011, James through counsel contacted the court numerous times and was simply told the case was pending with the judge.
On July 19, 2011, James filed a Request for Riding or Other Action by Court, and received no response from the court. Between August 1, 2011 and September 28, 2011, James through counsel again contacted the court numerous times and was rebuffed with the same excuse provided to James in earlier inquiries.
On September 28, 2011, James filed a Request for Status Hearing, again with no response from the court. During the week of December 26-30, 2011, James through counsel physically inquired at the court, at which a court clerk searched for the file and located it in the chambers of the presiding judge. The court clerk then informed James’s counsel that the matter would be set for hearing, and counsel would receive a notice of hearing the following week. Over three weeks later when no notice of hearing was received, James filed a Petition for Writ to this Court on January 24, 2012.
On January 25, 2012, a day after the Petition for Writ was filed, Respondent Window Rock Family Court filed a Motion to Deny Petition for Writ of Mandamus or Superintending Control on the basis of mootness, having scheduled a status conference on James’s adoption for February 7, 2012 and issued a Notice of Hearing setting Preliminary Hearing and Order for Setting Preliminary Hearing, Temporary Custody, Separate Proceeding, Denying Waiver of Investigation. In its Order, the family court ordered stricken all information regarding adoption and required that James file a separate petition for adoption, declaring that termination of parental rights require a judgment separate from adoption and, therefore, must be separated from adoption proceedings. The court then ordered that the adoption petition, when filed, will be allowed to be consolidated with the termination of parental rights proceedings. The court explained that she was assigned to the Window Rock Judicial District in July, 2011, the first three months were over-docketed, a large percentage of court cases were assigned all at once to her from two judges, and the matter was “inadvertently not scheduled for a hearing.” The court then went on, in relevant part, to deny James’s motion to waive a social services investigation on the basis that social services is needed to advise the court on provisions for visitation to relatives because under “the Diñé concept of ⅛⅝ it is the child’s right to know his origins and to protect that right, thus, notice must be given to the maternal relatives.” Order at ¶ 8.
On January 27, 2012, James filed a response opposing the family court’s Motion *45 to Deny Petition for Writ of Mandamus or Superintending Control. James stated that the family court provides no assurance that the court will not resume the same inaction in the future in this or other matters before it, and that dismissal for mootness would leave “the respondent simply tree to resume the wrongful act at a later time and place.” Response, p. 6. James asserted that the lengthy inaction has left him with few legal rights or protections for the child’s care. James asserted that the family court had disregarded its institutional obligation to timely act on matters filed by the public who “have no choice but to come before the court to seek legal remedies.” Id. James then asked this Court to recognize “a voluntary cessation” exception to the mootness doctrine. On February 3, 2012, we denied the family court’s motion and issued an alternative writ. On February 10, 2012, the family court filed its brief in opposition to a permanent writ.
II
We have stated that the Anglo doctrine of mootness is consistent with Navajo values, since when parties in dispute have resolved their issues and achieved hozho under the principle of ⅛⅞ there is no further role for the court. See In re Mental Health Services for Bizardi, 8 Nav. R. 593, 597, 5 Am. Tribal Law 467 (Nav.Sup. Ct.2004) (stating that the prerequisite for a case in our adversarial courts is disharmony). However, this case reminds us that our courts are also used to formalize undisputed matters via a court order. Here, we have a nephew seeking to adopt his aunt’s infant daughter with the consent of both natural parents. It is clear that our holding regarding mootness in Bizar-di, supra, needs to be expanded to provide for a court’s role in undisputed situations.
Additionally, it is clear that the family court’s issuance of a Notice of Hearing does not provide assurance that court delays and unresponsiveness will cease. In In re Termination of Yazzie and Barney, 7 Am. Tribal Law 539 (Nav.Sup.Ct. 2007) we stated, distinguishing Bizardi, that this Court will not consider as moot matters capable of being repeated. Id., 7 Am. Tribal Law at 540-41, fn. 2. We will address such situations out of consideration for “other individuals who are in the same situation as the appellees, these individuals and the Navajo Nation need guidance as to the law.” Id. We find that there is no assurance that other individuals will not have to appear before us citing the same failure to timely process their cases. Therefore, the matter is not moot and we will issue a permanent writ. The integrity of the legal system needs to be maintained. See Perry v. Navajo Nation Labor Commission, 6 Am. Tribal Law 780, 785-86 (Nav.Sup.Ct.2006) (stating that this Court has the power to review non-theoretical questions, including questions where the ultimate issue before this Com*t involves the need to maintain the integrity of the Diñé legal system). Our concern for other individuals who must use our courts require that the mandate that we would impose here on the Window Rock judicial district also be generally applicable to all Navajo Nation courts. We do not wish to see this type of systemic failure experienced in the future by litigants in any of our courts.
In its Response Brief, the family court took responsibility for the inaction and delays, and further, asked the Court not to require adherence to strict time-lines. Instead, the family court requested that this Court allow discretion to address timelines on a case-by-case basis according to the complexity of each case. Response Brief at 11-12. However, as we will dis *46 cuss below, procedures and timeframes mandated by statute and court rules that do not leave room for unfettered discretion, or which do not provide for exceptions, must be regarded as mandates and not merely aspirational timelines.
The family court stated in its Response Brief that James’s joint TPR/Adoption filing caused delay because the court normally requires separate petitions for a TPR and adoption, and therefore James’s joint petition was “atypical.” Response Brief at 14. However, by its own admission, the family court stated that there were practical problems that went beyond this case. In its January 24, 2012 Order for Setting Preliminary Hearing, Temporary Custody, Separate Proceeding and Denying Waiver of Investigation, the family court explained that as a newly assigned judge to the Window Rock Judicial District, she had to handle a docket left over from two judges all at once, indicating there were systemic delays. Id. ¶ 4. We note that the record shows there were additional reasons for the delays. According to James, the case file had to be searched for by the staff and was subsequently found in the judge’s chambers, indicating that original case files are not accounted for when removed from the clerk’s office. Furthermore, the record also shows that the court had not yet docketed the case as late as July 19, 2011 even though James filed the case on May 3, 2011, meaning that the case was unaccounted for in the court system through that date. See Request for Ruling at 2 (raising concern that his petition has not yet even been assigned a docket number); Order for Setting Preliminary Hearing, Temporary Custody, Separate Proceeding, Denying Waiver of Investigation, f 3 (judge states she is unaware why case was not docketed).
Clearly, protective measures need to be taken in order to ensure timely and proper processing and accounting of cases and case files no matter how large the docket. To achieve this, we need to distinguish between the responsibilities of the Court Administrator overseeing administrative court staff, and the adjudicative function of judges.
As far back as 1999, the adjudicative-administrative distinction was acknowledged and the need for timely processing and tracking of cases was noted in the Judicial Branch Case Management Policy (CMP), which was adopted by resolution of the Judicial Conference in July, 1999 [1] and Administrative Order 18-99, issued on September 13, 1999. The CMP requires that the court conduct a status review and enter a final judgment within six months of any filing unless the complexity of the case requires more time, at which the court must provide reasons for the delay. CMP at § 111(A)(3). Administrative Order 18-99, issued by the Chief Justice pursuant to his 7 N.N.C. § 371 powers, established a policy requiring, inter alia, that our courts docket and enter filings within one hour of their filing, that courts respect parties’ right to appeal a final judgment by timely issuing that judgment, and that applications for emergency or extraordinary relief be immediately taken to the presiding judge by the administrative staff of the judicial district courts.
James asks that the CMP be deemed mandatory. However, we must note that the CMP is not a rule of practice and procedure, as it was not duly adopted by the Supreme Court pursuant to certain public notice and consultation requirements as set forth at 7 N.N.C. § 601. It is also in need of update and review to keep pace with developments of the past thir *47 teen years. By its language, the policy is aspirational, to be read as “flexible guidelines.” CMP at 1. Non-conformance to the aspirational timeframes and procedures in the CMP will not subject a court to issuance of a writ.
Ill
We will now address areas in which a writ of mandamus shall issue, and which shall also serve as guidance to all Navajo Nation courts.
A.Statutory and Rule-Based Timeframes
9 N.N.C. § 601 et seq. which governs adoptions, requires the Court to “order a date for hearing not more than 90 days from the date of filing of the petition.” 9 N.N.C. § 606(D). This language does not prescribe what type of hearing[2] must be held so long as action is taken within the deadline. We interpret the spirit of this provision as requiring the court to act expeditiously on an adoption filing in order to ensure the family or families involved that their matter is being processed. The Window Rock judicial district court shall ensure that the mandate of Section 606(D) is followed. All other courts shall perform accordingly.
B.Prompt Action “Upon ” or “After Filing”
At the time of the filing, TPRs were governed under 9 N.N.C. § 1301 et seq. as part of the old Children’s Code. Old Section 1304(A) required the Court to order a social study “[u]pon the filing of a petition,” while old Section 1303(A) required the clerk of the Family Court to set a time and place for hearing “after a petition for termination of parental rights has been filed.” The provisions divided action duties between the court and the court clerk. While neither provision sets forth numerical timeframes for action, we read “upon filing” or “after the filing” as requiring action within specific time periods as follows. We interpret the “upon filing” wording as to require prompt action by the court or court clerk. We interpret the “after the filing” wording as requiring action as soon as practicable after priority matters have been attended to. We acknowledge that these above provisions are no longer in force.
As to adoption, the adoption statute remains in place. 9 N.N.C. § 609(A) requires the family court to request a social services investigation “upon filing of a petition for adoption.” By any measure of time, this was not done by the presiding judge despite numerous requests by James.
We direct that the Window Rock judicial district shall apply this Court’s interpretations of the words “upon filing” or “after the filing” in all future cases where these words appear in any statute or rule. All other courts shall act accordingly.
C.Duties of the Court Administrator
Under the Alchíní bi Beehaz’áanii Act, effective January 2, 2012, TPRs are now governed at 9 N.N.C. § 1401 et seq. The old provisions specifically mentioned court clerks in terms of scheduling responsibility, but the new provisions do not. However, the new provisions mandate the court to schedule a hearing within 15 days from filing and to conduct a final hearing on the TPR petition “not to exceed a period of six (6) months from the date of filing.” 9 N.N.C. § 1407(B) and (C). Re *48 gardless of whether court clerks are mentioned by statute, administrative functions remain with the Court Administrator and his or her administrative staff.
We note as a practical matter that court clerks docket cases and schedule hearings under the supervision of the Judicial District Court Administrator. Judges are not in charge of case files, scheduling, nor of supervision of staff engaged in these functions. It is Judicial Branch policy to distinguish judicial responsibilities from administrative responsibilities. The Window Rock judicial district Court Administrator shall ensure that court staff properly dockets and tracks the status of proceedings in each case; schedules hearings within deadlines established by law or, otherwise, in a timely manner; and keeps track of the original case file by a reliable accounting method. The location of the original case file must be known at all times in order to preserve the record and in order for scheduling duties to be met. It is the duty of each and every Court Administrator in our judicial districts to perform accordingly. Furthermore, it is the responsibility of the Administrative Offices of the Courts to provide systemic planning and support to the Court Administrators to ensure these duties are met.
IV
Although not part of the writ, we must now address the family court’s interpretation of the Alchíní bi Beehaz’áanii Act with respect to adoptions. In Shirley v. Morgan, 9 Am. Tribal Law 46 (Nav.Sup.Ct.2010) we established principles for issuing clarifying opinions out of a recognition that the public welfare may sometimes require that this Court step in and address matters related to a present suit that have not been raised. Namely, this Court may issue a clarifying opinion ma sponte or at a party’s request in connection with an issue in the present suit likely to cause future harms, and clarification is needed to forestall imminent costly suits and provide finality. Id., 9 Am. Tribal Law at 67-68.
In its Response Brief, the family court in interpreting the Alchíní bi Beehaz’áanii Act stated that ““[i]f there is no termination of parental rights, then there can be no adoption.” Response Brief at 14. We do not accept the family court’s interpretation and find that urgent clarification now is needed for guidance to all our courts in order to prevent unnecessary and harmful terminations of parental rights in adoption matters, forestall costly suits, and provide finality.
The philosophy expressed in the Alchíní bi Beehaz’áanii Act provides that “[germination of parental rights is not the custom or tradition of the Navajo people” and that “severance of the parent-child relationship can be sought as a last resort and after all options, including customary adoptions, are considered by the party requesting the termination of the parent/child relationship.” (Emphasis added). 9 N.N.C. § 1401. The new law clearly expresses this philosophy, whereas the old Children’s Code emphasized formal court processes.
The Alchíní bi Beehaz’áanii Act specifically restores traditional Navajo philosophy and values to laws governing the disposition of Navajo Nation children. In re A.M.K, 9 Am. Tribal Law 191 (Nav.Sup.Ct.2010), we emphasized that children have a right to continued contact with their clan relationships. In re A.M.K. stands for the court’s affirmative duty under the best interest of the child standard to ensure that a child is supported, safe, and has meaningful contact with his or her clan family. Id., 9 Am. Tribal Law at 199-200. There is no doubt that even in adoptions, continued meaningful contact with *49 the clan family is protected, including parents and extended family.
Formal adoptions are governed at 9 N.N.C. § 601 et seq. and are entirely separate from the Alchíní bi Beehaz’áanii Act. In 9 N.N.C. § 615, the Navajo Nation disfavors informal arrangements and favors “formal adoption” of Navajo children in cases where the natural parents are dead, or where children are neglected continuously or abandoned. However, formal adoptions are not necessarily favored in other cases. Additionally as stated in the new 9 N.N.C. § .1401, the Council now emphasizes “customary adoptions” and all other options before TPR may even be considered as a last resort in any case.
9 N.N.C. § 1403 of the Alchíní bi Bee-haz’áanii Act provides for “voluntarily relinquishment” of parental rights, even in cases where adoption is not sought. However, we note that the Alchíní bi Bee-haz’áanii Act serves primarily to address circumstances of substantial disharmony or discord involving children, not intra-familial arrangements that are done in the spirit of k’é and hozho. This distinction is critical in view of our Diñé philosophy towards children in relation to their families of origin, as expressed in our statutes and common law.
Read together, the Alchíní bi Beehaz’áanii Act and adoption statute plainly provide that TPR may not be forced upon natural parents seeking to file an adoption proceeding unless TPR is warranted under the TPR provisions of the Alchíní bi Beehaz’áanii Act. The natural parents may voluntary also seek TPR in an adoption proceeding, but may not be ordered to do so. Additionally, in all cases where TPR is considered, the court must make a specific finding that TPR is a last alternative after other options have been considered, including customary adoption.
We note that pursuant to 9 N.N.C. § 611 of the adoption statute, upon a final decree of formal adoption, a parent-child relationship “shall exist” between the child and adoptive parent(s), while the natural parent(s) are “relieved of parental responsibilities,” and “shall have no rights to the child.” Read against the whole of our laws, we interpret this provision as not requiring a forced severance of the parent-child relationship through TPR, but does require a clear delineation between the parental rights and duties that henceforth exists in the adoptive parent(s), and the clan-based responsibilities of the natural parent(s) as relatives that must be maintained in the best interest of the child. Such delineation may be stipulated in pretrial settlement or peacemaking.
The Alchíní bi Beehaz’áanii Act does not define “customary adoptions.” We will note that the California tribal customary adoption statute, sponsored by the Soboba Band of Luiseno Indians, defines it as “a traditional tribal practice recognized by the community which gives a child a permanent parent-child relationship with someone other than the child’s birth parent, without termination of parental rights.” AB 1325 Calif. Assembly, enacted July 1, 2010. This definition is entirely in keeping with the philosophy embodied in our laws and is hereby adopted. In essence, the child gains parent(s) in a customary adoption, and does not lose the parents he or she already has, nor does the child lose his or her clan and clan relatives. This is the philosophy embodied in our laws and long recognized in customary adoptions on the Navajo Nation. The parties may seek to formalize the primary and secondary parental responsibilities, ideally through peacemaking, before the court issues a customary adoption order. As customary adoptions are not addressed by the adoption statute per se, social stud *50 ies reports are not statutorily required unless provisions of the Alchíní bi Bee-haz’áanii Act are also implicated,
We note that our interpretation of statutory laws must always be done with consideration of, and in conformance with, our traditional laws. In this case, the Council itself has expressed its policy with great clarity.
The judicial district courts shall address future adoption proceedings accordingly.
V
Accordingly, we HEREBY enter a permanent writ of mandamus directing the Window Rock Judicial District Court to strictly adhere to the duties and responsibilities discussed herein. All other Navajo Nation courts shall act consistent with this opinion.
As a final matter, the Court feels compelled to state that the circumstances and conduct described herein could call for re-proval, but the Court will stop short of that and simply state that the failure to promptly docket a filing, disregard for statutory law, loss of the original case file temporarily, and the adjudicatory inactions and delays shown in this case, cannot be condoned nor tolerated in our Navajo Nation courts.

. Subsequently revised on August 18, 1999 by memorandum of the Chief Justice.

. These may include shelter, temporary custody or motions hearings, orders for Social Services investigations, referrals to peacemaking, and so forth.